USCA1 Opinion

 

 September 29, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 94-1031 WILLIAM H. SULLIVAN II, Plaintiff - Appellee, v. PAUL TAGLIABUE, ET AL., Defendants -Appellees. ____________________ NATIONAL FOOTBALL LEAGUE, & MEMBERS OF THE NATIONAL FOOTBALL LEAGUE Defendants - Appellants. ____________________ ERRATA SHEET The opinion of this Court issued on September 16, 1994, is amended as follows: The caption on the coversheet should read: "William H. Sullivan II, Plaintiff - Appellee v. National Football League, & Members of the National Football League." "Paul Tagliabue, et al., Defendants - Appellees" should be deleted. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1031 WILLIAM H. SULLIVAN II, Plaintiff - Appellee, v. NATIONAL FOOTBALL LEAGUE, & MEMBERS OF THE NATIONAL FOOTBALL LEAGUE Defendants - Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _____________________ John Vanderstar, with whom Sonya D. Winner, Ethan M. Posner, _______________ _______________ _______________ Covington & Burling, Jeremiah T. O'Sullivan, Sarah Chapin _____________________ ________________________ ______________ Columbia, Choate, Hall & Stewart, Joseph W. Cotchett, and ________ _________________________ ____________________ Cotchett, Illston & Pitre were on brief for appellants. _________________________ Joseph L. Alioto and Frederick P. Furth, with whom Angela M. ________________ __________________ _________ Alioto, Law Offices of Joseph L. Alioto, Alan R. Hoffman, Lynch, ______ _______________________________ _______________ ______ Brewer, Hoffman & Sands, Bruce J. Wecker, Michael P. Lehmann and ________________________ _______________ __________________ Furth, Fahrner & Mason, were on brief for appellees. ______________________ ____________________ September 16, 1994 ____________________ TORRUELLA, Circuit Judge. The National Football League _____________ and twenty-one organizations owning NFL franchises (referred to collectively as the "NFL") appeal the judgment entered against them after a jury found that the NFL violated the antitrust laws by restricting owners of member football clubs from selling shares in their teams to the public. Plaintiff-appellee, William H. Sullivan, former owner of the New England Patriots football team (the "Patriots"), was awarded a total of $51 million in damages for the losses Sullivan incurred when he had to sell the Patriots to a private buyer after the NFL prevented him from offering 49% of the team to the public in the form of publicly traded stock. Because several prejudicial errors were committed during the trial, we vacate the judgment and remand for a new trial. I. BACKGROUND I. BACKGROUND Under Article 3.5 of the NFL's constitution and by- laws, three-quarters of the NFL club owners must approve all transfers of ownership interests in an NFL team, other than transfers within a family. In conjunction with this rule is an uncodified policy against the sale of ownership interests in an NFL club to the public through offerings of publicly traded stock. The members, however, retain full authority to approve any given transfer by a three-quarters vote according to Article 3.5. Sullivan owned the Patriots from the team's inception in 1959 until October of 1988. When Sullivan formed the -2- Patriots, he and his partner sold non-voting shares of the team to the public beginning in 1960. At that time, the Patriots were in the old American Football League ("AFL"), which was separate from the NFL, and which had no policy against public ownership of teams. In 1966, the AFL and the old NFL merged into a single league. Under the terms of the merger, the new NFL would adopt the old NFL's policy against public ownership. The Patriots, however, were allowed to retain their level of public ownership as a special exception to the rule under a grandfather clause. In 1976, Sullivan sought to acquire the publicly held shares of the Patriots through a merger of the club into a new Sullivan-owned company. Stockholders approved the transfer and the transaction was subsequently consummated, although some shareholders subsequently brought suit, challenging the sufficiency of the purchase price. After protracted litigation, the shareholders obtained a judgment requiring Sullivan to pay them a higher price for their shares. The Patriots then became a fully privately owned club. Sullivan and his son, Chuck Sullivan, who owned the stadium where the Patriots played, began to experience financial difficulties and increasing debt burdens in the mid-1980s. The Sullivans decided that they needed to raise capital to alleviate their financial problems. After the Boston Celtics professional basketball franchise made a public offering of 40% of the team in December of 1986, the Sullivans decided to pursue a similar deal with the Patriots in order to raise cash to cover some of their -3- debts. On October 19, 1987, the Sullivans met with Stephens, Inc., a small investment banking firm in Little Rock, Arkansas. They discussed a debt financing deal whereby Stephens would loan the Sullivans $80 million dollars, with half going to the Patriots and the other half to Chuck Sullivan's company which owned the Patriots' stadium. The Patriots' portion of the loan would be repaid out of the proceeds of the sale of 49% of the Patriots through the offering of public stock. Stephens agreed to look into the possibility of arranging the deal, but informed the Sullivans that they would first have to get NFL approval. Sullivan ultimately never obtained NFL approval and the deal with Stephens never progressed beyond some preliminary discussions. At a meeting of the NFL owners on October 27, 1987, Sullivan raised his stock sale idea with the other owners and asked for a modification of the NFL's policy against public ownership to allow for certain controlled sales of minority interests in NFL clubs. Alternatively, Sullivan requested a waiver from the public ownership policy for his contemplated public offering of the Patriots. Sullivan's request was eventually tabled at this meeting. Discussions continued among the owners and, at one point, Sullivan counted 17 of the 21 owners needed for approval as being in favor of allowing him to make his public offering (seven owners were still undecided). Pete Rozelle, NFL Commissioner at the time, told Sullivans that he was not in favor of Sullivan's proposals and that league -4- approval was "very dubious." Sullivan ultimately never asked for a vote on amending the ownership policy or on waiving the policy for the Patriots, and the NFL never held such a vote. Sullivan claims that he did not ask for a vote because it would have been futile. In October of 1988, Sullivan sold the Patriots for approximately $83.7 million to KMS Patriots L.P. ("KMS"), a limited partnership owned by Victor Kiam and Francis Murray. Sullivan alleges that, absent the NFL's public ownership policy, he would have been able to retain a majority share of a rapidly appreciating asset with a high potential for future profits. Instead, Sullivan asserts, he was forced to sell the Patriots at a depressed price to private buyers. On May 16, 1991, Sullivan sued the NFL claiming that, among other things, the NFL had violated the Sherman Antitrust Act, 15 U.S.C. 1-2, by preventing him from selling 49% of the Patriots to the public in an equity offering. Sullivan alleged that, as a result, he was forced to sell the entire team to a private buyer at a fire sale price in order to pay off existing debts. Prior to trial, the district court dismissed Sullivan's claim under 2 of the Sherman Act along with various state law claims. After a trial on Sullivan's claim under 1 of the Sherman Act, the jury rendered a verdict for Sullivan in the amount of $38 million, which the judge later reduced through remittitur to $17 million. Pursuant to 15 U.S.C. 15, which provides for treble damages for antitrust violations, the court -5- entered a final judgment for Sullivan of $51 million. -6- II. ANALYSIS II. ANALYSIS The NFL has raised a number of issues on appeal concerning the application of 1 of the Sherman Act to the facts of this case, which, according to the NFL, entitle it to judgment as a matter of law. We address these issues first to see if the present case should be dismissed, and we ultimately conclude that it should not. We next address the NFL's allegations of trial error and we find that several of them require that we overturn the verdict in this case and order a new trial. The first set of issues involves the district court's denial of the NFL's motions for judgment as a matter of law under Fed. R. Civ. P. 50. We review the court's decision de novo, _______ using the same stringent decisional standards that controlled the district court. Gallagher v. Wilton Enterprises, Inc., 962 F.2d _________ _________________________ 120, 125 (1st Cir. 1992); Hendricks & Assocs., Inc. v. Daewoo __________________________ ______ Corp., 923 F.2d 209, 214 (1st Cir. 1991). Under these standards, _____ judgment for the NFL can only be ordered if the evidence, viewed in the light most favorable to Sullivan, points so strongly and overwhelmingly in favor of the NFL, that a reasonable jury could not have arrived at a verdict for Sullivan. Gallagher, 962 F.2d _________ at 124-25; Hendricks, 923 F.2d at 214. _________ III. ISSUES ALLEGEDLY REQUIRING JUDGMENT FOR THE NFL III. ISSUES ALLEGEDLY REQUIRING JUDGMENT FOR THE NFL A. Lack of Antitrust Injury A. Lack of Antitrust Injury To establish an antitrust violation under 1 of the Sherman Act, Sullivan must prove that the NFL's public ownership policy is "in restraint of trade." Monahan's Marine, Inc. v. _______________________ -7- Boston Whaler, Inc., 866 F.2d 525, 526 (1st Cir. 1989). Under ___________________ antitrust law's "rule of reason," the NFL's policy is in restraint of trade if the anticompetitive effects of the policy outweigh the policy's legitimate business justifications. Id. at __ 526-27 (citing Business Electronics Corp. v. Sharp Electronics __________________________ __________________ Corp., 485 U.S. 717, 723 (1988)). Anticompetitive effects, more _____ commonly referred to as "injury to competition" or "harm to the competitive process," are usually measured by a reduction in _____________ output and an increase in prices in the relevant market. ______ ____________________ National Collegiate Athletic Ass'n v. Board of Regents of Univ. ___________________________________ __________________________ of Okla., 468 U.S. 85, 104-07 (1984) ("Restrictions on price and _________ output are the paradigmatic examples of restraints of trade") (hereinafter "NCAA"); Chicago Professional Sports Ltd. ____ _______________________________________ Partnership v. National Basketball Association, 961 F.2d 667, 670 ___________ _______________________________ (7th Cir.), cert. denied, 113 S. Ct. 409 (1992). Injury to ____ ______ competition has also been described more generally in terms of decreased efficiency in the marketplace which negatively impacts ____________________ consumers. Town of Concord v. Boston Edison Co., 915 F.2d 17, _______________ _________________ 21-22 (1st Cir. 1990), cert. denied, 499 U.S. 931 (1991); ____ ______ Interface Group, Inc. v. Massachusetts Port Auth., 816 F.2d 9, 10 _____________________ ________________________ (1st Cir. 1987). Thus, an action harms the competitive process "when it obstructs the achievement of competition's basic goals - - lower prices, better products, and more efficient production methods." Town of Concord, 915 F.2d at 22. _______________ The jury determined in this case, via a special verdict form, that the relevant market is the "nationwide market for the -8- sale and purchase of ownership interests in the National Football League member clubs, in general, and in the New England Patriots, in particular." The jury went on to find that the NFL's policy had an "actual harmful effect" on competition in this market. The NFL argues on appeal that Sullivan has not established the existence of any injury to competition, and thus has not established a restraint of trade that can be attributed to the NFL's ownership policy. The league's attack is two-fold, asserting (1) that NFL clubs do not compete with each other for the sale of ownership interests in their teams so there exists no competition to be injured in the first place; and (2) Sullivan did not present sufficient evidence of injury to competition from which a reasonable jury could conclude that the NFL's policy restrains trade. Although we agree with the NFL that conceptualizing the harm to competition in this case is rather difficult, precedent and deference to the jury verdict ultimately require us to reject the NFL's challenge to the finding of injury to competition. Critically, the NFL does not challenge on appeal the ___ jury's initial finding of the relevant market and no corresponding challenge was raised at trial.1 As a result, the ____________________ 1 The NFL argues in passing that certain expert testimony related to the relevant market issue was inherently unreasonable and thus could not support the jury's relevant market finding. We do not consider this passing argument to be sufficient to raise the relevant market issue on appeal as matters averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived on appeal. United ______ States v. Innamorati, 996 F.2d 456, 468 (1st Cir. 1993). More ______ __________ importantly, the NFL did not challenge the relevant market issue -9- NFL faces an uphill battle in its attack on the presence of an injury to competition. Given the existence of a relevant market for ownership interests in NFL teams, it is reasonable to presume that a policy restricting the buying and selling of such ownership interests injures competition in that market. The NFL nevertheless maintains that NFL teams do not compete against each other for the sale of their ownership interests, even if we accept that a market exists for such ownership interests. 1. No Competition Subject to Injury as Matter of Law 1. No Competition Subject to Injury as Matter of Law _________________________________________________ The NFL correctly points out that member clubs must cooperate in a variety of ways, and may do so lawfully, in order to make the football league a success. See United States ___ ______________ Football League v. National Football League, 842 F.2d 1335, 1372 _______________ ________________________ (2d Cir. 1988); Los Angeles Memorial Coliseum Comm'n v. National _____________________________________ ________ Football League, 726 F.2d 1381, 1391-92 (9th Cir.), cert. denied, _______________ ____ ______ 469 U.S. 990 (1984) (hereinafter "L.A. Coliseum"); North American _____________ ______________ Soccer League v. National Football League, 670 F.2d 1249, 1251 ______________ _________________________ (2d Cir.), cert. denied, 459 U.S. 1074 (1982) (hereinafter ____ ______ "NASL"). On the other hand, it is well established that NFL ____ clubs also compete with each other, both on and off the field, for things like fan support, players, coaches, ticket sales, local broadcast revenues, and the sale of team paraphernalia. Mid-South Grizzlies v. National Football League, 720 F.2d 772, ___________________ _________________________ ____________________ in either its directed verdict motion or in its motion for judgment as a matter of law. We will not consider arguments which could have been, but were not, advanced below. Domegan v. _______ Fair, 859 F.2d 1059, 1065 (1st Cir. 1988). ____ -10- 786-87 (3d Cir. 1983), cert. denied, 467 U.S. 1215 (1984); L.A. ____ ______ ____ Coliseum, 726 F.2d at 1390, 1393, 1395, 1397. The question of ________ whether competition exists between NFL teams for sale of their ownership interests, such that the NFL's ownership policy injures this competition, is ultimately a question of fact. The NFL would have us find, however, that, as a matter of law, NFL teams do not compete against each other for the sale of their ownership interests. We decline to make such a finding. The NFL relies on a series of cases which allegedly stand for the "well established" rule that a professional sports league's restrictions on who may join the league or acquire an interest in a member club do not give rise to a claim under the antitrust laws. Seattle Totems Hockey Club, Inc. v. National __________________________________ ________ Hockey League, 783 F.2d 1347 (9th Cir.), cert. denied, 479 U.S. _____________ ____ ______ 932 (1986); Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. _______ ________________ 1986); Mid-South Grizzlies, 720 F.2d at 772; Levin v. National ___________________ _____ ________ Basketball Ass'n, 385 F. Supp. 149 (S.D.N.Y. 1974). These cases, ________________ all involving a professional sport's league's refusal to approve individual transfers of team ownership or the creation of new teams, do not stand for the broad proposition that no NFL ownership policy can injure competition. See, e.g., NASL, 670 ___ ____ ____ F.2d at 1259-61 (finding that the NFL's policy against cross- ownership of NFL teams and franchises in competing sports leagues, which also effectively barred certain owners who owned other sports franchises from purchasing NFL teams, injured competition between the NFL and competing sports leagues and thus -11- violated 1 of the Sherman Act). None of the cases cited by the NFL considered the particular relevant market that was found by the jury in this case or a league policy against public ownership. Seattle Totems ______________ and Mid-South Grizzlies considered potential inter-league _____________________ _____ competition when a sports league rejected plaintiffs' applications for new league franchises. Seattle Totems, 783 F.2d ______________ at 1349-50; Mid-South Grizzlies, 720 F.2d at 785-86. Those ____________________ decisions found no injury to competition because the plaintiffs were not competing with the defendant sports leagues, but rather, were seeking to join those leagues. Seattle Totems, 783 F.2d at ______________ 1350; Mid-South Grizzlies, 720 F.2d at 785-86. Mid-South ____________________ _________ Grizzlies left open the possibility that potential intra-league _________ _____ competition between NFL football clubs could be harmed by the NFL's action, but found that the plaintiff in that case had not presented sufficient evidence of harm to such competition. Mid- ____ South Grizzlies, 720 F.2d at 786-87. _______________ The Fishman and Levin cases concerned the National _______ _____ Basketball Association's ("N.B.A.") rejection of plaintiffs' attempts to buy an existing team. Fishman, 807 F.2d at 525-31; _______ Levin, 385 F. Supp. at 150-51. Those cases also based their _____ finding that there was no injury to competition on the fact that the plaintiffs were seeking to join with, rather than compete against, the N.B.A. Fishman, 807 F.2d at 544; Levin, 385 F. _______ _____ Supp. at 152. Neither case considered whether competition between teams for investment capital was injured. As pointed out -12- in Piazza v. Major League Baseball, 831 F. Supp. 420 (E.D.Pa. ______ ______________________ 1993), Fishman explicitly recognized the potential for _______ competition in the market for ownership of teams, although the plaintiff had failed to raise the issue, and Levin simply _____ presumed, incorrectly, that there could never be any competition among league members. Piazza, 831 F. Supp. at 430-31 & n.16 ______ (citing Fishman, 807 F.2d at 532 n.9; and Levin, 385 F. Supp. at _______ _____ 152). The important distinction to make between the cases cited by the NFL and the present case is that here Sullivan alleges that the NFL's policy against public ownership generally restricts competition between clubs for the sale of their ownership interests, whereas in the aforementioned cases, a league's refusal to approve a given sale transaction or a new team merely prevented particular outsiders from joining the league, but did not limit competition between the teams themselves. To put it another way, the NFL's public ownership policy allegedly does not merely prevent the replacement of one club owner with another -- an action having little evident effect on competition -- it compromises the entire process by which competition for club ownership occurs.2 ____________________ 2 This same argument distinguishes cases cited by the NFL for the proposition that a franchisor's disapproval of a proposed sale of a franchise does not give rise to an antitrust injury. See Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5th Cir. ___ __________ ______________________ 1975), cert. denied, 424 U.S. 943 (1976); McDaniel v. General ____ ______ ________ _______ Motors Corp., 480 F. Supp. 666 (E.D.N.Y. 1979). Individual _____________ decisions to block the sale of a franchise do not implicate the harm to competition that is caused by a policy restricting all sales of a certain type of ownership interest. Only the broad- -13- We take a moment to briefly address a related argument raised by the NFL to the effect that NFL clubs are unable to conspire with each other under 1 of the Sherman Act because they function as a single enterprise in relation to the league's public ownership policy. The NFL asserts that the Supreme Court's holding in Copperweld Corp. v. Independence Tube Corp., ________________ _______________________ 467 U.S. 752 (1984), controls the facts of this case and overturns prior caselaw holding that NFL clubs do not constitute a single enterprise but rather, are separate entities which were capable of conspiring with each other under 1. See L.A. ___ ____ Coliseum, 726 F.2d at 1387-90; NASL, 670 F.2d at 1256-58. ________ ____ We do not agree that Copperweld, which found a __________ corporation and its wholly owned subsidiary to be a single enterprise for purposes of 1, Copperweld, 467 U.S. at 771, __________ applies to the facts of this case or affects the prior precedent concerning the NFL. See McNeil v. National Football League, 790 ___ ______ ________________________ F. Supp. 871, 879-80 (D.Minn. 1992) (holding that Copperweld did __________ not apply to the NFL and its member clubs and finding the clubs to be separate entities capable of conspiring together under 1). Copperweld's holding turned on the fact that the subsidiary __________ of a corporation, although legally distinct from the corporation itself, "pursue[d] the common interests of the whole rather than interests separate from those of the corporation itself." Copperweld, 467 U.S. at 770. As emphasized in City of Mt. __________ ____________ ____________________ based policy has the potential to compromise the entire competitive process for the buying and selling of a good in a relevant market. -14- Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268 _______________ ______________________________ (8th Cir. 1988), upon which the NFL relies for the application of Copperweld to this case, the critical inquiry is whether the __________ alleged antitrust conspirators have a "unity of interests" or whether, instead, "any of the defendants has pursued interests diverse from those of the cooperative itself." Id. at 274-77 __ (defining "diverse" as "interests which tend to show that any two of the defendants are, or have been, actual or potential competitors"). As we have already noted, NFL member clubs compete in several ways off the field, which itself tends to show that the teams pursue diverse interests and thus are not a single enterprise under 1. Ultimately, the NFL's Copperweld challenge is subsumed __________ under the question of whether or not the evidence can support a finding that NFL teams compete against each other for the sale of their ownership interests. Proof of such competition defeats both the NFL's challenge to the existence of an injury to competition and the NFL's Copperweld argument as well. __________ Insufficient proof of such competition would require a judgment in favor of the NFL anyway, regardless of the implications under Copperweld. As we discuss below, the jury's finding that there __________ exists competition between teams for the sale of ownership interests was based on sufficient evidence. 2. Insufficient Evidence of Harm to Competition 2. Insufficient Evidence of Harm to Competition ____________________________________________ The NFL contends that Sullivan did not present sufficient evidence concerning: (1) the existence of competition -15- between NFL clubs for the sale of ownership interests, or (2) a decrease in output, an increase in prices, a detrimental effect on efficiency or other incidents of harm to competition in the relevant market, from which a reasonable jury could conclude that the NFL's policy injured competition. Although we agree that the evidence of all these factors is rather thin, we disagree that the evidence is too thin to support a jury verdict in Sullivan's favor. With respect to evidence of the existence of competition for the sale of ownership interests, one of Sullivan's experts, Professor Roger Noll, testified that "one of the ways in which the NFL exercises monopoly power in the market for the franchises and ownership is by excluding certain people from owning all or part -- any type part of an NFL franchise." Dr. Noll explained that this "enables a group of owners, in this case, you only need eight owners, to exclude from the League and from competing with them, people who might be more effective competitors than they are." The record also contains statements from several NFL owners which could reasonably be interpreted as expressions of concern about their ability to compete with other teams in the market for investment capital in general, and for the sale of ownership interests in particular. For example, Arthur Rooney II of the Pittsburgh Steelers stated in a letter that he did not "believe that the individually or family owned teams will be able to compete with the consolidated groups." Ralph Wilson of the Buffalo Bills stated that big corporations -16- should not own teams because it gives them an "unfair competitive advantage" over other teams since corporations will funnel money into the team and make it "more competitive" than the other franchises. Former NFL Commissioner Pete Rozelle admitted that similar sentiments had been expressed by NFL members. Although it is not precisely clear that the "competition" about which Noll, Rooney, and Wilson were discussing is the same competition at issue here -- that is competition for the sale of ownership interests -- a jury could reasonably interpret these statements as expressing a belief that the competition exists between teams for the sale of ownership interests. The statements of the two NFL owners imply that greater access to capital for all teams will put increased pressure on some teams to compete with others for that capital, and all the statements reveal that the ownership rules, particularly the rule against public ownership, is the main obstacle preventing such access. The fact that ownership by "consolidated groups" is not necessarily the same as public ownership does not affect the conclusion that teams face competitive pressure in selling their ownership interests generally to whoever might buy them. We also note that evidence of actual, present competition is not necessary as long as the evidence shows that the potential for competition exists. See L. ___ __ A. Coliseum, 726 F.2d at 1394 (discussing significance of ____________ potential competition, especially where challenged policy limits _________ such competition so that it is not evident in practice). It -17- would be difficult indeed to provide direct evidence of competition when the NFL effectively prohibits it. The NFL focusses on the fact that Professor Noll testified that many of the purchasers of Patriots' stock would be New England sports fans and others in the New England area. The NFL points out that other NFL teams would not compete with the Patriots for the sale of stock to their own fans. This argument slightly distorts Professor Noll's testimony. Professor Noll stated that local souvenir buyers would be one portion of the market for Patriots stock. Professor Noll also testified several times that other investors would buy Patriots stock as well, for investment purposes. Noll's point was that the souvenir buyers would serve to bid up the price of the stock above what the price would normally be if the Patriots were a regular company. His testimony did not preclude a finding that NFL teams compete against each other for investment capital via the sale of ownership interests. The record also contains sufficient evidence of the normal incidents of injury to competition from the NFL's policy - - reduced output, increased prices, and reduced efficiency -- to support the jury's verdict. As Dr. Noll pointed out in his testimony, the NFL's policy "excludes individuals . . . who might want to own a share of stock in a professional football team." Several NFL officials themselves admitted that the policy restricts the market for investment capital among NFL teams. There is thus little dispute that the NFL's ownership policy -18- reduces the available output of ownership interests. The NFL is correct that, in one sense, the overall pool of potential output is fixed because there are only 28 NFL teams and, although their value may fluctuate, the quantity of their ownership interests cannot. However, the NFL's public ownership policy completely wipes out a certain type of ownership interest -- public ownership of stock. By restricting output in one form ____ of ownership, the NFL is thereby reducing the output of ownership interests overall. In other words, the NFL is literally restricting the output of a product -- a share in an NFL team. There was considerable testimony concerning the price effects of the NFL policy. Both of Sullivan's experts testified that the policy depressed the price of ownership interests in NFL teams because NFL franchises would normally command a premium on the public market relative to their value in the private market, which is all that the league currently permits. Professor Noll testified that fan loyalty would push up the price of ownership interests if sales to the public were allowed. Even former Commissioner Pete Rozelle acknowledged that "it was pointed out, with justification, it has been over the years, that [the ownership policy] does restrict your market and, very likely, the price you could get for one of our franchises if you wanted to sell it, because you are eliminating a very broad market . . . . And they have said that there is a depression on the price they could get for their franchise." The NFL points out that the alleged effect of its -19- ownership policy is to reduce prices of NFL team ownership ______ interests, rather than to raise prices which is normally the measure of an injury to competition. E.g., Town of Concord, 915 ____ _______________ F.2d at 22. We acknowledge that it is not clear whether, absent some sort of dumping or predatory pricing, see, e.g., Monahan's ___ ____ _________ Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 527 (1st Cir. ____________ ___________________ 1989), a decrease in prices can indicate injury to competition in a relevant market. The Supreme Court has emphasized, however, that overall consumer preferences in setting output and prices is more important than higher prices and lower output, per se, in ______ determining whether there has been an injury to competition. NCAA, 468 U.S. at 107. In this case, regardless of the exact ____ price effects of the NFL's policy, the overall market effects of the policy are plainly unresponsive to consumer demand for ownership interests in NFL teams. Dr. Noll testified that fans are interested in buying shares in NFL teams and that the NFL's policy deprives fans of this product. Moreover, evidence was presented concerning the public offering of the Boston Celtics professional basketball team which demonstrated, according to some of the testimony, fan interest in buying ownership of professional sports teams. Thus, a jury could conclude that the NFL's policy injured competition by making the relevant market "unresponsive to consumer preference." Id.3 __ ____________________ 3 The NFL maintains that price and output are not affected because its ownership policy does not limit the number of games or teams, does not raise ticket prices or the prices of game telecasts and does not affect the normal consumer of the NFL's product in any other way. Such facts might be relevant to an -20- As for overall efficiency of production in the relevant market,4 Sullivan's experts testified that the NFL's policy hindered efficiency gains, and that allowing public ownership would make for better football teams. Professor Noll stated that the NFL's public ownership policy prevented individuals who might be "more efficient and much better at running a professional football team" from owning teams. Dr. Noll also stated that publicly owned NFL teams would be better managed, and produce higher quality entertainment for the fans. Noll testified that the ownership rule excluded certain types of management structures which would likely be more efficient in running the teams, resulting in higher franchise values. One NFL owner, Lamar Hunt, acknowledged that increased access to capital can improve a team's operations and performance. A memorandum prepared by an NFL staff member stated that changes to the NFL's ____________________ inquiry of whether the NFL's policy harms overall efficiency, see ___ infra note [4], but it is not relevant to whether the policy _____ affects output and prices in the relevant market for ownership _______________________ interests. Just because consumers of "NFL football" are not affected by output controls and price increases does not mean that consumers of a product in the relevant market are not so affected. In this case, two types of consumers are denied products by the NFL policy: consumers who want to buy stock of the Patriots or other teams, and consumers like Sullivan who want to "purchase" investment capital in the market for public financing. 4 Although the product at issue in the relevant market is "ownership interests," efficiency in production of that product can be measured by the value of the ownership interest. That is, an improved product produced more efficiently will be reflected in the value of the output in question (regardless of the price). In this case, the value of the product depends on the success of the Patriots' football team, the overall efficiency of its operations, and the success of the NFL in general. -21- public ownership policy could contribute to each NFL team's own financial strength and viability, which in turn would benefit the entire NFL because the league has a strong interest in having strong, viable teams. The NFL presented a large amount of evidence to the contrary and now claims on appeal that Sullivan's position was based on nothing more than sheer speculation. We have reviewed the record, however, and we cannot say that the evidence was so overwhelming that no reasonable jury could find against the NFL and in favor of Sullivan. We therefore refuse to enter judgment in favor of the NFL as a matter of law. B. Ancillary Benefits B. Ancillary Benefits The NFL next argues that even if its public ownership policy injures competition in a relevant market, it should be upheld as ancillary to the legitimate joint activity that is "NFL _________ football" and thus not violative of the Sherman Act. We take no issue with the proposition that certain joint ventures enable separate business entities to combine their skills and resources in pursuit of a common goal that cannot be effectively pursued by the venturers acting alone. See, e.g., Broadcast Music, Inc. v. ___ ____ _____________________ Columbia Broadcasting System, Inc., 441 U.S. 1 (1979). We also __________________________________ do not dispute that a "restraint" that is ancillary to the functioning of such a joint activity -- i.e. one that is required to make the joint activity more efficient -- does not necessarily violate the antitrust laws. Broadcast Music, 441 U.S. at 23-25; _______________ Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, _________________________ _____________________ -22- at 223-24 (D.C. Cir. 1986), cert. denied, 479 U.S. 1033 (1987); ____ ______ see also Northwest Wholesale Stationers, Inc. v. Pacific _________ _______________________________________ _______ Stationery & Printing Co., 472 U.S. 284, 295-96 (1985). We ___________________________ further accept, for purposes of this appeal, that rules controlling who may join a joint venture can be ancillary to a legitimate joint activity and that the NFL's own policy against public ownership constitutes one example of such an ancillary ______ rule. Finally, we accept the NFL's claim that its public ownership policy contributes to the ability of the NFL to function as an effective sports league, and that the NFL's functioning would be impaired if publicly owned teams were permitted, because the short-term dividend interests of a club's shareholder would often conflict with the long-term interests of the league as a whole. That is, the policy avoids a detrimental conflict of interests between team shareholders and the league. We disagree, however, that these factors are sufficient to establish as a matter of law that the NFL's ownership policy does not unreasonably restrain trade in violation of 1 of the Sherman Act. The holdings in Broadcast Music, Rothery Storage, ________________ _______________ and Northwest Stationers, do not throw the "rule of reason" out ____________________ the window merely because one establishes that a given practice among joint venture participants is ancillary to legitimate and efficient activity -- the injury to competition must still be weighed against the purported benefits under the rule of reason. See, e.g., Broadcast Music, 441 U.S. at 24 (holding only that a ___ ____ _______________ particular ancillary restraint did not constitute a per se _______ -23- violation of the Sherman Act and remanding for a determination of the case under a rule of reason analysis); Northwest Stationers, ____________________ 472 U.S. at 293-98 (same); see also SCFC ILC, Inc. v. Visa U.S.A. ________ ______________ ___________ Inc., 819 F. Supp. 956, 979-80 (D.Utah 1993) (finding that the ____ existence of a joint venture may save a restraint from per se ______ illegality but not from the normal rule of reason scrutiny). One basic tenet of the rule of reason is that a given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint. L.A. Coliseum, 726 ______________ F.2d at 1396. The record contains evidence of a clearly less restrictive alternative to the NFL's ownership policy that would yield the same benefits as the current policy. Sullivan points to one proposal to amend the current ownership policy by allowing for the sale of minority, nonvoting shares of team stock to the public with restrictions on the size of the holdings by any one individual. Dividend payments, if any, would be within the firm control of the NFL majority owner. Under such a policy, it would be reasonable for a jury to conclude that private control of member clubs is maintained, conflicts of interest are avoided, and all the other "benefits" of the NFL's joint venture arrangement are preserved while at the same time teams would have access to the market for public investment capital through the sale of ownership interests. C. Causation of Injury in Fact C. Causation of Injury in Fact -24- The NFL next argues that Sullivan did not present sufficient evidence to support a finding by the jury that the NFL's public ownership policy caused injury in fact to Sullivan. An antitrust plaintiff must prove that he or she suffered damages from an antitrust violation and that there is a causal connection between the illegal practice and the injury. Associated General __________________ Contractors, Inc. v. California State Council of Carpenters, 459 _________________ _______________________________________ U.S. 519, 532-33 & n.26 (1983); Blue Shield of Virginia v. _________________________ McCready, 457 U.S. 465, 476-78 (1982); Engine Specialties, Inc. ________ ________________________ v. Bombardier Ltd., 605 F.2d 1, 13 (1st Cir. 1979), cert. denied, _______________ ____ ______ 446 U.S. 983 (1980). "Plaintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause." Engine Specialties, 605 F.2d at __________________ 14. Sullivan asserted at trial that the NFL's ownership policy forced him to sell the Patriots at a depressed price, far below what the team would have been worth in a market that included public ownership of the team. "But for" the NFL's policy, Sullivan claims, he would have been able to offer 49% of the Patriots to the public for $70 million, pay off his debts, and retained ownership of a much more valuable and profitable team. The NFL contends that Sullivan failed to establish a causal connection between his "forced" sale of the Patriots and the NFL's ownership policy because (1) Sullivan never officially requested a vote on his proposals to amend or waive the policy so -25- there is no way of knowing whether the policy would have prevented a public offering in the first place; and (2) Sullivan never established that the public stock sale was feasible or potentially successful and thus an alternative to what ultimately happened (i.e., even if the NFL did not have a policy against public ownership, Sullivan would still have had to sell his team because the Patriots stock sale would not have happened or would not have raised enough money to pay off Sullivan's debts and prevent a fire sale of the team). Although the evidence of causation is not overwhelming, it is nevertheless sufficient to support the verdict. Regarding the NFL's first claim that Sullivan never called for a vote from the owners to change or waive the ownership policy, Sullivan presented sufficient evidence to show that the NFL essentially rejected Sullivan's request, even though no official vote was taken. Under certain circumstances, an antitrust plaintiff must make a demand on the defendant to allow the plaintiff to take some action or obtain some benefit, which the defendant's challenged practice is allegedly preventing the plaintiff from taking or obtaining, in order to prove that the practice caused injury in fact to the plaintiff. See Wells Real ___ __________ Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816 ____________ ______________________________ (1st Cir.), cert. denied, 488 U.S. 955 (1988); Out Front ____ ______ __________ Productions, Inc. v. Magid, 748 F.2d 166, 170 (3d Cir. 1984). _________________ _____ Such a requirement only applies, however, where the plaintiff cannot otherwise prove that the illegal practice exists or that -26- the practice is preventing the plaintiff from competing in the relevant market; in such cases, a refused demand is the only reliable evidence of causation. Out Front, 748 F.2d at 169-70. _________ In cases like the present one, an official request and official refusal is not necessary to establish causality because there is other evidence showing that defendant's practice caused injury in fact to the plaintiff. Zenith Radio Corp. v. Hazeltine Research, __________________ __________________ 395 U.S. 100, 120 n.15 (1969); Continental Ore Co. v. Union ____________________ _____ Carbide & Carbon Corp., 370 U.S. 690, 699-702 (1962). There is _______________________ certainly no blanket requirement, as the NFL maintains, in Wells _____ or any other case, that Sullivan must call for a vote and obtain an official refusal from the NFL, even if such a request would be futile. See, e.g., Wells, 850 F.2d at 816 (finding failure to ___ ____ _____ request access to multiple listing service was critical because "[t]here was no evidence of a group boycott;" although court noted request "may have been futile," there was no evidence to indicate that it would have been, so an actual request was required); Chicago Ridge Theatre Ltd. Partnership v. M & R _________________________________________ _______ Amusement Corp., 855 F.2d 465, 470 (7th Cir. 1988) (futility _______________ obviates the need for a demand). Certainly, if Sullivan can prove futility independent of any official request, he need not show that he actually called for a vote and received a denial from the other NFL owners. The jury in this case heard evidence that would allow it to conclude that the NFL effectively denied Sullivan's request for a waiver or amendment of the public ownership policy, and -27- that an official vote would indeed have been futile. The NFL's policy against public ownership was long-standing, and the policy withstood several efforts to change it over the years as proffered amendment proposals were never brought to a vote. Sullivan requested a wavier of, or amendment to, the policy at a meeting of the owners on October 27, 1987. His request was tabled. After further discussions, then-Commissioner Pete Rozelle said that he opposed the proposal and that the chances for league approval were "very dubious." Although Sullivan was only four votes shy of winning a vote, with seven votes still undecided, the jury could reasonably conclude that, in light of the Commissioner's statement, Sullivan tried but failed to convince those undecided owners to vote in his favor and that an actual vote would have been futile. The evidence is thus sufficient to support a finding that the NFL's policy was effectively enforced against Sullivan and that the policy did in fact, when considered with the evidence discussed below, prevent Sullivan from making his public offering of 49% of the Patriots. Sullivan also presented sufficient evidence to support a finding that the Patriots stock sale was both feasible and potentially successful. Sullivan met with Stephens, Inc., an investment banking firm, to discuss a deal whereby Stephens would arrange for a loan of $80 million to Sullivan and his son, half of which would be paid back out of the proceeds of the Patriots stock offering, which Stephens would also arrange. In a subsequent letter, Stephens stated that it had been retained to -28- assist in the "private placement of $80 million of debt" and set out some preliminary terms and conditions. Although specifics of the public offering were not discussed, and Stephens did not determine whether the stock offering was ultimately feasible, Stephens repeatedly made it clear to Sullivan that NFL approval was required -- indeed Stephens specifically singled out NFL approval as the prerequisite -- before Stephens could proceed any ___ further with efforts to prepare for the placement of Patriots stock. As discussed above, NFL approval was never obtained. Therefore, the jury could conclude that lack of approval was the reason Stephens was unwilling to proceed with the deal, even though Stephens also expressed some concern about Sullivan's financial and legal troubles. The jury also heard testimony that Charles Allen, a prominent investment banker in New York, thought the Patriots public offering was feasible and that he was potentially interested in arranging the deal. Sullivan himself testified that the stock sale was feasible based on his experience with the previous public offering of Patriots stock in 1960, and based on the public offering of the Boston Celtics. Finally, one of Sullivan's experts, Patrick Brake, testified that the public offering would have been feasible had the NFL not blocked it. In addition, despite significant financial and legal problems with the Patriots, the evidence is sufficient to support a finding that Sullivan could have solved these problems in the -29- course of the public offering and, further, that he could have brought off a successful stock sale that would have raised at least $70 million. The NFL focusses its challenge to the potential success of Sullivan's offering on the testimony of Patrick Brake, who provided the $70 million figure as the value for the stock sale. According to the NFL, Brake's testimony could not support the jury's finding on causation because it was not supported by any facts, it was not grounded in any rational methodology, and it ignored important factors indicating that the Patriots offering would not be a success. The NFL does not challenge the admissibility of Brake's opinion but, instead, claims that his opinion cannot support the jury's finding that the Patriots stock sale would have been a success if the NFL had allowed it to happen. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." Brooke Group, _____________ Ltd. v. Brown & Williamson Tobacco Corp., 113 S. Ct. 2578, 2589 ____ ________________________________ (1993); accord Price v. General Motors Corp., 931 F.2d 162, 165 ______ _____ ____________________ (1st Cir. 1991); Richardson v. Richardson-Merrell, Inc., 857 F.2d __________ ________________________ 823, 829 (D.C. Cir. 1988), cert. denied, 493 U.S. 882 (1989). A ____ ______ jury verdict cannot rest solely on an expert's "bottom line" conclusion, without some underlying facts and reasons, or a logical inferential process to support the expert's opinion. -30- Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d ________________________ _______________________ 1333, 1339 (7th Cir. 1989). We agree that the facts and reasoning underlying Brake's opinions and testimony leave much to be desired from the standpoint of a factfinder charged with determining the facts. As a matter of law, however, Brake provided enough of a basis for his opinions and had sufficient facts to back his opinions up, to support, in combination with the evidence from other sources, a jury finding of potential success of the Patriots stock sale venture. To begin with, Brake stated in his testimony that his opinion was based on a review of documents and depositions in the case, a review of the prospectus for the Boston Celtics public offering, the fact that future television revenues for the Patriots were likely to increase due to the Patriots' appearance in the Super Bowl, and the fact that the public stock for NFL teams, like the Patriots, would trade at a premium value over what the club would otherwise be worth. Brake also stated that he looked at a financial statement of the Patriots and was apprised of some of the debt and loss history of the club. Other testimony and evidence at trial supported the claim that stock of NFL teams would sell for a premium above the club's private sale value and the claim that TV revenues to the NFL teams would increase. Sullivan himself testified that a public offering would be successful based upon the success of his earlier offering of Patriots stock and on the results of the Celtics public offering. There was also testimony -- highly disputed, -31- but potentially credible testimony nonetheless -- to the effect that the Celtics' stock offering was a success and that the Patriots stock offering could be patterned after the Celtics offering. As for the source of Brake's specific $70 million figure for the likely proceeds from a sale of 49% of the Patriots, Brake explained a two-step public offering process which, after subtracting underwriting fees, would yield the Sullivan's $70 million. Brake arrived at this figure after starting with a base value of $150 million for the Patriots. Given the $80 million private sale price of the Patriots obtained by Sullivan when he actually sold the team, and given the testimony by Brake and others that public stock of NFL teams would sell at a premium, we cannot say that the opinion by Brake, an investment banking expert, was unreasonable or "not supported by sufficient facts to validate it in the eyes of the law." Brooke Group, 113 S. Ct. at 2589. ____________ Brake's testimony was not merely conclusory. Rather, it was embellished by various explanations and justifications. His testimony was also not overwhelmingly contradicted by the weight of the evidence or inherently contradictory, unreasonable or irrational. Brake did overlook some important factors that contradicted his opinion, but he was questioned about these factors on cross-examination and the NFL argued them before the jury. The factors do not invalidate Brake's opinion as a matter of law; rather, they merely go to the weight and credibility of -32- his opinions which are matters for the jury to consider. The basis of the opinion regarding the success of the Patriots public offering may be flimsy, but it is not nonexistent or irrational as a matter of law. Although we share the NFL's skepticism that Sullivan would have succeeded in his public offering if the NFL had allowed him to try it, we cannot say that, as a matter of law, the evidence was so overwhelming that no reasonable jury could find that the NFL's policy harmed Sullivan by preventing him from doing something he would otherwise have been able to do. We therefore reject the NFL's claim that it is entitled to a judgment in its favor on the basis that Sullivan failed to prove his injury was caused by the alleged antitrust violation. D. Assignment of Antitrust Claim D. Assignment of Antitrust Claim The NFL argues that Sullivan cannot bring this lawsuit because he sold his antitrust claim when he sold the Patriots. The sale contract between Sullivan and KMS Patriots, L.P., provided that Sullivan transferred to the buyers "all other assets" of the Patriots' and its holding company,5 besides those specifically listed and those specifically excluded. None of the listed or excluded assets include an antitrust claim. According to the NFL, the term "all other assets" should be interpreted ____________________ 5 The language of the contract actually states "all other assets of Selling Group," which includes Sullivan himself. However, neither party asserts that Sullivan intended to transfer all his personal assets with this clause and, anyway, the "all other assets" clause is number seventeen on a list of items referred to by the contract as "the following assets of the Club and Holdco [the Patriots' holding company]." -33- broadly to include the present antitrust cause of action. We disagree. Absent some express language to the effect that Sullivan was selling his football related "antitrust claims" or, at the very least, "causes of action," we cannot find that Sullivan assigned the present antitrust claim to the buyers of the Patriots. Gulfstream III Assocs., Inc. v. Gulfstream _______________________________ __________ Aerospace Corp., 995 F.2d 425, 437-40 (3d Cir. 1993); see also ________________ ________ Lerman v. Joyce Int'l, Inc., 10 F.3d 106, 112 (3d Cir. 1993) ______ __________________ (affirming requirement in Gulfstream that assignment of claim __________ must be "express" but expanding definition of "express" language to include a grant of "all causes of action, claims and demands of whatsoever nature"). As no such express language appears in the contract for the sale of the Patriots, Sullivan did not transfer his interest in the present lawsuit to KMS Patriots when he sold the team. The NFL's arguments concerning the application of 1 of the Sherman Act to the facts of this case raise a substantial challenge to the jury verdict and are certainly weighty enough to give us pause. Upon careful consideration of the issues, however, we find Sullivan's theory of the case to be a plausible one and ultimately find the evidence sufficient to support it. For the foregoing reasons, therefore, we see no justification, as a matter of law, for ringing the death knell on this litigation. IV. TRIAL ERRORS IV. TRIAL ERRORS Having reviewed those issues which would have warranted a judgment in favor of the NFL, had we decided any of those -34- issues in the NFL's favor, we now turn to the NFL's claim that it is entitled to a new trial because of allegedly erroneous jury instructions and other trial errors. In particular, the NFL asserts that the district court failed to provide the jury with several crucial jury instructions that were required in order to present to the jury certain legal theories that were potentially dispositive of the verdict. The NFL argues that the court's failure to give the instructions was prejudicial error requiring a new trial. Determining whether the failure to give proffered jury instructions is error depends on whether the instructions actually given to the jury, taken as a whole, adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues of the case. Davet v. _____ Maccarone, 973 F.2d 22, 26 (1st Cir. 1992); Transnational Corp. _________ ____________________ v. Rodio & Ursillo, Ltd., 920 F.2d 1066, 1070 (1st Cir. 1990); ______________________ see also L.A. Coliseum, 726 F.2d at 1398 ("The question, then, is ________ _____________ whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues."). We must also consider whether the NFL's proposed instructions are accurate or misleading. Shane v. Shane, 891 F.2d 976, 987 (1st _____ _____ Cir. 1989). "As long as the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party." Brown v. Trustees of Boston Univ., 891 F.2d 337, 354 _____ _________________________ -35- (1st Cir. 1989), cert. denied, 496 U.S. 937 (1990) (internal ____ ______ quotations omitted). A party, however, is entitled to have its legal theories on controlling issues, which are supported by the law and by the evidence, presented to the jury. Jerlyn Yacht _____________ Sales, Inc. v. Roman Yacht Brokerage, 950 F.2d 60, 68 (1st Cir. ___________ _____________________ 1991); L.A. Coliseum, 726 F.2d at 1398. An error in the jury ______________ instructions will warrant the reversal of the judgment and a new trial only if, upon review of the record as a whole, the error is determined to be prejudicial. Davet, 973 F.2d at 26; Jerlyn _____ ______ Yacht Sales, 950 at 69; Transnational Corp., 920 F.2d at 1070. ___________ ___________________ In this case, we find that the failure to give certain instructions was prejudicial error6 and we therefore vacate the judgment and order a new trial. A. Equal Involvement Defense A. Equal Involvement Defense The NFL argued before the district court that Sullivan was a complete and substantially equal participant in the NFL's ownership policy which he now challenges in the present lawsuit. As a result of Sullivan's involvement, the NFL claimed, Sullivan was barred from bringing a damages action under the antitrust laws pursuant to the "equal involvement defense" doctrine. The district court denied motions for summary judgment and a directed verdict on this issue and, further, refused to instruct the jury on the availability of the defense because it found that the ____________________ 6 The court's failure to instruct on the complete involvement defense was prejudicial error and, by itself, sufficient grounds for reversal and a new trial. We do not decide whether any of the other errors, standing alone, are prejudicial. We do hold, however, that all the errors taken together are prejudicial. -36- evidence showed that Sullivan "had very little, if any, involvement in the formulation of [the public ownership] rule," and because the rule "was imposed on [Sullivan] by a preexisting National Football League rule." This ruling constituted prejudicial error because the "equal involvement defense" is an absolute defense to an antitrust claim and because the evidence warranted sending the issue to the jury. A plaintiff's "complete, voluntary, and substantially equal participation" in an illegal practice under the antitrust laws precludes recovery for that antitrust violation. CVD, Inc. __________ v. Raytheon Co., 769 F.2d 842, 856 (1st Cir. 1985), cert. denied, ____________ ____ ______ 475 U.S. 1016 (1986); General Leaseways, Inc. v. National Truck ________________________ ______________ Leasing Ass'n, 830 F.2d 716, 720-23 (7th Cir. 1987); THI-Hawaii, _____________ ___________ Inc. v. First Commerce Financial Corp., 627 F.2d 991, 995 (9th ____ _______________________________ Cir. 1980); see also Bateman Eichler, Hill, Richards, Inc. v. _________ _______________________________________ Berner, 472 U.S. 299, 310-11 (1985) (applying equal involvement ______ defense in securities law context). In order to establish an "equal involvement" defense, an antitrust defendant must prove, by a preponderance of the evidence, that the plaintiff bears at least substantially equal responsibility for an anticompetitive restriction by creating, approving, maintaining, continually and actively supporting, relying upon, or otherwise utilizing and implementing, that restriction to his or her benefit.7 General _______ ____________________ 7 The Supreme Court in Bateman added an additional requirement _______ to the "equal involvement" defense: that "preclusion of suit would not significantly interfere with the effective enforcement of" the antitrust laws. Bateman, 472 U.S. at 311. We do not see _______ a preclusion of Sullivan's damages action as presenting any -37- Leaseways, 830 F.2d at 720-26; CVD, 769 F.2d at 856. It is not _________ ___ essential to the defense that the plaintiff actually helped author or create the policy, although such facts would be highly probative, as long as the plaintiff was substantially responsible for maintaining and otherwise effectuating the policy. See, ___ e.g., General Leaseways, 830 F.2d at 723 (applying equal ____ __________________ involvement defense in case where plaintiff did not participate in the actual adoption of the policy although plaintiff was substantially involved in supporting, enforcing and maintaining the policy).8 On the other hand, proof that the plaintiff benefitted from the challenged policy or failed to object to the policy, without more, is not sufficient to show "substantially equal participation." See id., 830 F.2d at 725 (noting that ___ __ "mere participation" in the challenged policy is not enough). Moreover, proof that the plaintiff was coerced ("economically" or ____________________ significant interference with antitrust law enforcement. The NFL's policy is still subject to challenge under the antitrust laws. Because the equal involvement defense only precludes a damages action, Sullivan could have requested injunctive relief when the public ownership policy was allegedly preventing him from selling 49% of his team. In addition, other owners who were not involved in the adoption or support of the policy may still bring suit should they desire to sell ownership interests in their team to the public. 8 To the extent this conflicts with the "but for" standard applied in THI-Hawaii, 627 F.2d at 995 (finding that "a __________ plaintiff's recovery is not barred unless the illegal conspiracy would not have been formed but for its participation"), we ________ decline to follow that portion of the case. There is no evidence of such a rigid "but for" requirement in the Supreme Court's formulation of the equal involvement defense in Bateman, 472 U.S. _______ at 310-11 (finding the defense applies where "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress"). -38- otherwise) into supporting the policy, that the plaintiff attempted to oppose the illegal conduct, or that the plaintiff's participation was otherwise not voluntary, is highly probative of the absence of complete and equal involvement by the plaintiff in an antitrust violation. E.g., CVD, 769 F.2d at 856. ____ ___ In this case, the evidence in the record was sufficient to support a jury instruction on the equal involvement defense. Sullivan was one of the three AFL members on the Joint Committee that established the policies, including the ownership policies, that were to govern the new expanded NFL. That Committee agreed, in a merger agreement signed by Sullivan, to adopt the NFL's policy against public ownership for the new NFL. Sullivan's son, Chuck, stated that Sullivan was the central figure in the merger negotiations. Sullivan subsequently relied on the NFL's public ownership policy to justify his purchase, through the merger of his team into a wholly owned company, of the outstanding stock of the Patriots in 1976. In the proxy statement for that transaction, Sullivan listed the NFL's policy against public ownership as one of the "Reasons for the Merger", and he attached a letter from the NFL justifying the public ownership policy and explaining that the continued presence of public stockholders conflicted with the interests of the league. Sullivan also affirmatively supported the policy in sworn testimony during the litigation with his former shareholders following the Patriots merger. Sullivan stated that the NFL's public ownership policy, and the justifications underlying the policy, were the reasons -39- for his desire to purchase all outstanding shares of the team. There is no evidence that Sullivan ever opposed or objected to theownership policypriorto thecircumstances surroundingthis case. Taken together, this evidence is sufficient for a reasonable jury to conclude that Sullivan bears substantially equal responsibility for the NFL's public ownership policy because Sullivan helped adopt the policy, he relied upon it, and he actively supported it. The jury, however, was never given an opportunity to consider this evidence in light of the equal involvement defense. Sullivan claims that he was not at the meetings in which Lamar Hunt, the chairman of the AFL committee, agreed to the NFL's public ownership policy, and that he did not know in advance that the old NFL's public ownership rule would be adopted by the new NFL. Mr. Hunt himself testified, however, that he always spoke for the entire AFL committee at his various meetings with NFL owners, and that he discussed various negotiating points with the other AFL owners, including Sullivan, before any decisions were made. Moreover, Sullivan's own team obtained a specific waiver from the ownership policy, which, a reasonably jury could infer, indicates that Sullivan was involved in the decision to adopt the policy. In any event, it is the jury's responsibility to weigh the evidence and make a choice in circumstances like this where the same evidence supports two different yet reasonable conclusions. The district court erred by failing to give the jury -40- the opportunity to choose between these versions of the facts. The court's "finding" that Sullivan's involvement in the public ownership policy was minimal ignores evidence in the record. The court's view that the NFL imposed the ownership policy on the AFL owners, rendering their participation involuntary, is largely unsupported by the record. Ultimately, however, these are factual questions for the jury and none of the instructions provided by the district court served to adequately instruct the jury on this issue or send the issue to the jury. Therefore, the district court erred in refusing to give the NFL's proffered instruction on the "equal involvement" defense. The error was prejudicial. By refusing to instruct the jury on the equal involvement defense, the district court deprived the NFL of a complete defense from Sullivan's lawsuit. The NFL presented facts that could have led to a dismissal of the case if they were believed by a properly instructed jury. While the NFL could have highlighted, and in fact did highlight, some of the facts concerning Sullivan's support of, and reliance upon, the ownership policy in its closing argument before the jury, this effort was limited to the argument that the NFL's policy was "reasonable" for purposes of the rule of reason analysis. The NFL did not, and could not, argue to the jury that it should rule in favor of the NFL because Sullivan's participation in the adoption and maintenance of the public ownership policy was complete, voluntary and substantially equal. Without the proffered instruction, the jury had no occasion to consider -41- whether Sullivan should be deprived of a damages remedy because of his involvement in the policy he now challenges. As a result, the district court's refusal to send the equal involvement defense to the jury was prejudicial error requiring a new trial. B. Failure to Request an Official Vote of the Owners B. Failure to Request an Official Vote of the Owners As discussed in Section II.C. above, in order to establish that the policy actually caused injury to himself, Sullivan must prove that the NFL effectively denied his request to waive or amend its policy against public ownership. While there is evidence that supports a finding that the NFL's policy effectively blocked Sullivan from pursuing his public offering, there is also sufficient evidence to support a contrary finding. Sullivan's failure to request a vote from the owners after he discovered that he was four votes shy of obtaining a waiver with seven owners still undecided, combined with former Commissioner Rozelle's testimony that he told Sullivan that Rozelle would put to the owners any plan that Sullivan wished, could support a finding that Sullivan was a "dormant plaintiff" who did not "spring into action" until it was "time to file suit." Out ___ Front, 748 F.2d at 170. As such, a jury could conclude that the _____ NFL did not prevent Sullivan from pursuing his stock sale, but instead, Sullivan simply dropped the idea for reasons unrelated to the NFL's policy. If the jury had reached such a conclusion, Sullivan would have failed to prove that his injury was caused by the antitrust policy, and judgment for the NFL would be required. The NFL proposed instructions concerning Sullivan's -42- failure to ask for a vote essentially stating that such a failure would result in judgment for the NFL if it was reasonable to require Sullivan to make such a request. The court refused to give the instruction because it felt that to do so would be to comment on the evidence, and the court did not want to comment on any of the evidence presented at trial. We understand the court's concern but believe that, under the facts of this case, there is a crucial point of law contained in the NFL's instruction that was not otherwise provided to the jury. The jury was instructed generally on the issue of causation, but it was not told that it had to determine whether the NFL's policy against public ownership was actually enforced against Sullivan; that is, whether the policy, the alleged antitrust restraint, actually restrained Sullivan in any way from making a 49% public offering of his team. Although the NFL could, and did, argue that Sullivan's failure to ask for a vote was evidence that the policy did not cause injury to Sullivan, there was no legal hook upon which the jury could hang the NFL's argument. The failure of Sullivan to request a vote is a critical and potentially dispositive issue in this case. If the alleged restraint of trade does not even exist in practice, the whole case essentially disappears. Therefore, the jury should have been directed to make a specific finding as to whether the public ownership policy was enforced against Sullivan. If the jury is instructed that Sullivan must prove that the NFL's policy was enforced against him, the jury will have -43- cause to consider the crucial matter of whether the NFL actually enforced its policy against Sullivan or rather, whether the NFL never had the chance to enforce its policy because Sullivan was never prepared to pursue his public offering. The instructions as proffered by the NFL may need to be tailored to avoid commenting on the evidence surrounding the "missing" vote by the NFL owners, but that does not excuse the court from giving no instruction at all on the issue. The failure to give some instruction concerning the failure of Sullivan to request a vote was error. C. The Murray Option C. The Murray Option In 1986, prior to Sullivan's decision to sell Patriots stock to the public, Sullivan sold Fran Murray an option to buy the entire club. The NFL took the position that the Murray option would have been an absolute bar to any public sale of Patriots stock and that Sullivan therefore could not prove causation. The NFL's position was supported by evidence introduced at trial. Sullivan proffered evidence that the option was not a bar to sale because the option could be bought out and because it could not be legally enforced. The issue of whether Murray could have, or would have, blocked a public offering by the Patriots was ultimately disputed. The option agreement and Murray's deposition testimony were received into evidence. The district court, however, refused to admit Murray's statement that he would indeed have stopped any public stock sale of the Patriots from going forward -44- if he had been told about it. The court found the testimony to be too speculative to be admissible. While the court's decision to exclude Murray's "speculative" testimony is well within the court's wide latitude of discretion in making such evidentiary rulings, United States v. Abel, 469 U.S. 45, 54 (1984); Doty v. _____________ ____ ____ Sewall, 908 F.2d 1053, 1058 (1st Cir. 1990), we note that ______ Sullivan's entire case as to the causation of injury was equally speculative. Whether Sullivan's proposed stock sale could have proceeded and would have been successful in the absence of the NFL's public ownership policy was a matter of considerable conjecture. Fairness would seem to militate towards allowing the NFL to present its own version of the probable course of future events to counter Sullivans' theorizing. In any event, the court's subsequent refusal to give the NFL's proffered jury instruction on the law of options, specifically the legal consequences of options under Massachusetts law, erroneously removed another crucial issue from the jury's purview. The Murray option was a key defense for the NFL, because if Sullivan did not have a legal right to sell Patriots stock to the public, he did not suffer any harm from the NFL's ownership policy and the NFL would have been entitled to judgment in its favor. Again, the NFL could make this argument to the jury, but the jury would still lack crucial information concerning the legal underpinnings of a crucial defense for the NFL. Sullivan argues that the NFL's proposed instruction -45- would have singled out one factual issue related to causation for the jury's special attention, something that would have unfairly prejudiced Sullivan. Sullivan adds that allowing the instruction would have generated countering instructions on other legal facets of option law that were relevant to Sullivan's position on the option issue and ultimately would have confused the jury. These arguments notwithstanding, we feel that, as long as suitable instructions are provided covering the basic legal points relevant to each party's arguments, the jury would not be unduly confused. Furthermore, the risk of prejudice from the instruction -- due to the added attention afforded one of the NFL's defenses -- is not sufficient to justify effectively depriving the NFL of a crucial defense. Ultimately, it was for the jury to decide whether the Murray option constituted an insurmountable obstacle to Sullivan's case on causation, and the district court's refusal to instruct on the law of options virtually removed this issue from consideration by the jury. D. Balancing Procompetitive and Anticompetitive Effects D. Balancing Procompetitive and Anticompetitive Effects in the Relevant Market in the Relevant Market As we noted above, the rule of reason analysis requires a weighing of the injury and the benefits to competition attributable to a practice that allegedly violates the antitrust laws. Monahan's Marine, 866 F.2d at 526. The district court ________________ instructed the jury on its verdict form to balance the injury to competition in the relevant market with the benefits to competition in that same relevant market. The NFL protested, claiming that all procompetitive effects of its policy, even -46- those in a market different from that in which the alleged restraint operated, should be considered. The NFL's case was premised on the claim that its policy against public ownership was an important part of the effective functioning of the league as a joint venture. Although it was not readily apparent that this beneficial effect applied to the market for ownership interests in NFL teams, the relevant market found by the jury, the NFL argued that its justification should necessarily be weighed by the jury under the rule of reason analysis. Sullivan responded, and the district court agreed, that a jury cannot be asked to compare what are essentially apples and oranges, and that it is impossible to conduct a balancing of alleged anticompetitive and procompetitive effects of a challenged practice in every definable market. The issue of defining the proper scope of a rule of reason analysis is a deceptive body of water, containing unforeseen currents and turbulence lying just below the surface of an otherwise calm and peaceful ocean. The waters are muddied by the Supreme Court's decision in NCAA -- one of the more ____ extensive examples of the Court performing a rule of reason analysis -- where the Court considered the value of certain procompetitive effects that existed outside of the relevant market in which the restraint operated. NCAA, 468 U.S. at 115-20 ____ (considering the NCAA's interest in protecting live attendance at untelevised games and the NCAA's "legitimate and important" interest in maintaining competitive balance between amateur -47- athletic teams as a justification for a restraint that operated in a completely different market, the market for the telecasting of collegiate football games).9 Other courts have demonstrated similar confusion. See, e.g., L.A. Coliseum, 726 F.2d at 1381, ___ ____ _____________ 1392, 1397, 1399 (stating that the "relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue" but then considering a wide variety of alleged benefits, and then directing the finder of fact to "balance the gain to interbrand competition against the loss of intrabrand competition", where the two types of competition operated in different markets). To our knowledge, no authority has squarely addressed this issue. On the one hand, several courts have expressed concern over the use of wide ranging interests to justify an otherwise anticompetitive practice, and others have found particular justifications to be incomparable and not in correlation with the alleged restraint of trade. Smith v. Pro _____ ___ Football, Inc., 593 F.2d 1173, 1186 (D.C. Cir. 1978); Brown v. _______________ _____ Pro Football, Inc., 812 F. Supp. 237, 238 (D.D.C. 1992); Chicago __________________ _______ Pro. Sports Ltd. Partnership v. National Basketball Ass'n, 754 F. ____________________________ _________________________ ____________________ 9 The Supreme Court did not expressly consider the issue presented here. Therefore, it is impossible to tell whether the Court was consciously applying the rule of reason to include a broad area of procompetitive benefits in a variety of markets, or whether the Court was simply not being very careful and inadvertently extended the rule of reason past its proper scope. There is certainly no language, as Sullivan suggests, indicating that the Court was considering the alleged benefit of "competitive balance" only to the extent that it had procompetitive effects in the market for televised football games. -48- Supp. 1336, 1358 (N.D.Ill. 1991). We agree that the ultimate question under the rule of reason is whether a challenged practice promotes or suppresses competition. Thus, it seems improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market. On the other hand, several courts, including this Circuit, have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets. See, e.g., NCAA, 468 ___ ____ ____ U.S. at 115-20; Grappone, Inc. v. Subaru of New England, Inc., ______________ ____________________________ 858 F.2d 792, 799 (1st Cir. 1988); M & H Tire Co. v. Hoosier _______________ _______ Racing Tire Corp., 733 F.2d 973, 986 (1st Cir. 1984); L.A. __________________ ____ Coliseum, 726 F.2d at 1381, 1392, 1397, 1399. Moreover, the ________ district court's argument that it would be impossible to compare the procompetitive effects of the NFL's policy in the interbrand _____ market of competition between the NFL and other forms of entertainment, with the anticompetitive effects of the intrabrand _____ market of competition between NFL teams for the sale of their ownership interests, is arguably refuted by the Supreme Court's holding in Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. ______________________ _________________ 36 (1977). Continental T.V. explicitly recognized that positive _________________ effects on interbrand competition can justify anticompetitive _____ effects on intrabrand competition. Id. at 51-59. Although _____ __ Continental T.V. can reasonably be interpreted as referring only ________________ to interbrand and intrabrand components of the same relevant ______________ -49- market, Hornsby Oil Co., Inc. v. Champion Spark Plug Co., 714 ______ ______________________ ________________________ F.2d 1384, 1394 (5th Cir. 1983), there is also some indication that interbrand and intrabrand competition necessarily refer to distinct, yet related, markets. Continental T.V., 433 U.S. at 52 ________________ n.19 ("The degree of intrabrand competition is wholly independent of the level of interbrand competition."). Arguably, the market put forward by the NFL -- that is the market for NFL football in competition with other forms of entertainment -- is closely related to the relevant market found by the jury such that the procompetitive benefits in one can be compared to the anticompetitive harms in the other. Clearly this question can only be answered upon a much more in-depth inquiry that we need not, nor find it appropriate to, embark upon at this time. Finally, we note that although balancing harms and benefits in different markets may be unwieldy and confusing, such is the case with a number of balancing tests that a court or jury is expected to apply all the time. Indeed, Justice Brandeis' famous formulation of the rule of reason seems to contemplate the balancing of a wide variety of factors and considerations, many of which are not necessarily comparable or correlative: The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, -50- the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. Board of Trade of the City of Chicago v. United States, 246 U.S. ______________________________________ _____________ 231, 238 (1918). Although the issue of the proper scope of the rule of reason analysis is more appropriately resolved in a case where it is dispositive and more fully briefed, we can draw at least one general conclusion from the caselaw at this point: courts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices; however, courts should also maintain some vigilance by excluding justifications that are so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade. In any event, we need not enter these dangerous waters to resolve the instant dispute. The NFL wanted the jury to consider its proffered justifications for the public ownership policy -- namely that the policy enhanced the NFL's ability to effectively produce and present a popular entertainment product unimpaired by the conflicting interests that public ownership would cause. These procompetitive justifications should have been considered by the jury, even under Sullivan's theory of the proper scope of the rule of reason analysis. As we point out in note [4] above, and as Sullivan himself points out, to the extent the NFL's policy strengthens and improves the league, resulting -51- in increased competition in the market for ownership interests in NFL clubs through, for example, more valuable teams, the jury may consider the NFL's justifications as relevant factors in its rule of reason analysis. The danger of the proffered instructions on the verdict form is that they may have mislead the jury into thinking that it was precluded from considering the NFL's justifications for its ownership policy. Therefore, the relevant market language on the verdict form should be removed, or else the jury should be informed that evidence of benefits to competition in the relevant market can include evidence of benefits flowing indirectly from the public ownership policy that ultimately have a beneficial impact on competition in the relevant market itself. E. References to Prior Antitrust Cases Against the NFL E. References to Prior Antitrust Cases Against the NFL Despite a pretrial motion in limine and repeated __________ objections by the NFL, the district court allowed the jury to hear numerous references to prior antitrust cases against the NFL. Evidence about prior antitrust violations by the defendant may, in appropriate cases, be admissible to show things like market power, intent to monopolize, motive, or method of conspiracy. United States Football League v. National Football _____________________________ _________________ League, 842 F.2d 1335, 1371 (2d Cir. 1988) (hereinafter "USFL"). ______ ____ Because of the inherently prejudicial nature of such evidence, however, evidence of prior antitrust cases involving the NFL are only admissible if Sullivan can demonstrate that the conduct underlying those prior judgments had a direct, logical -52- relationship to the conduct at issue in the present case. USFL, ____ 842 F.2d at 1371; International Shoe Mach. Corp. v. United Shoe ______________________________ ___________ Mach. Corp., 315 F.2d 449, 454 (1st Cir.), cert. denied, 375 U.S. ___________ ____ ______ 820 (1963) (plaintiff must show "that his claimed injury stemmed directly and proximately from the same type of practice condemned in the prior Government action"); see also Coleman Motor Co. v. ________ __________________ Chrysler Corp., 525 F.2d 1338, 1351 (3d Cir. 1975). In many of _______________ the instances where Sullivan or his counsel made references to prior antitrust cases at trial, Sullivan failed to satisfy this burden. Sullivan argues that the prior cases were relevant either to certain testimony regarding the reasonableness of the NFL's ownership policy and voting requirements or to the issue of defining the relevant market. Because none of the cases mentioned at trial concerned the NFL's ownership policy at issue here, evidence of those prior cases is not relevant to the reasonableness of the NFL's policy against public ownership. The general voting requirements are not in dispute, so cases touching solely upon them are also not relevant. Certain limited portions of some prior antitrust decisions are relevant to the issue of defining the relevant market. The testimony and commentary at trial concerning these prior cases, however, was not limited to the relevant market portions of these cases and, on the contrary, focussed primarily on the issue of whether the NFL's public ownership policy was unreasonable. As such, that evidence was prejudicial, without any balancing relevance to justify its -53- admission into evidence. The references to prior NFL cases were made in a number of different contexts during the trial (including during direct examination, cross-examination, and at closing argument), and they contained a variety of different information. These references are not likely to be repeated in precisely the same context upon a new trial. Therefore, instead of identifying which particular pieces of evidence were inadmissible, we think it would be more useful to point out more generally that references to prior NFL cases are not relevant to the issue of the reasonableness of the NFL's public ownership policy and such references should be excluded if they contain information about the unreasonableness of other policies of the NFL which were at issue in the other cases. Reversed and remanded. _____________________ -54-