MOTORSPORTS RACING PLUS,
INC., Petitioner, Appellant,

v.

ARCTIC CAT SALES,
INC., Respondent,

Polaris Sales, Inc., Respondent,

Bombardier Motor Corporation of
America, a Delaware corporation,
Respondent,

Yamaha Motor Corporation, a
California corporation,
Respondent,

International Snowmobile Racing,
a Wisconsin corporation,
Respondent,

International Snowmobile Manufac-
turers Association, a Michigan
corporation, Respondent.

No. C4–02–530.

Supreme Court of Minnesota.

July 24, 2003.

Wood R. Foster, Jr., Jordan M. Lewis, Vickie L. Loher, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for appellants.

Annamarie A. Daley, Gary L. Wilson, Christopher A. Seidl, Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, for respondent Arctic Cat Sales Inc.

George W. Soule, Daniel J. Brennan, Bowman & Brooke, LLP, Minneapolis, MN; and J. Robert Robertson, Andrew A. Kassof, Kirkland & Ellis, Chicago, IL, for respondent Polaris Sales, Inc.

Robert A. Schwartzbauer, Paul J. Robbenolt, Scott M. Stearns, Dorsey & Whitney LLP, Minneapolis, MN, for respondent Bombardier Motor Corporation of America.

James L. Volling, Jason K. Walbourn, Jesseca R.F. Grassley, Faegre & Benson LLP, Minneapolis, MN; and Theodore Whitehouse, Willkie, Farr & Gallagher, Washington, DC, for respondent Yamaha Motor Corporation, U.S.A.

Kay Nord Hunt, Stacey A. DeKalb, Stephen C. Rathke, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN, for respondent International Snowmobile Manufacturers Association.

## OPINION

HANSON, Justice.

Appellant Motorsports Racing Plus, Inc. (MRP) filed suit against the respondents, several snowmobile manufacturers and their trade association (Manufacturers), alleging antitrust violations and commercial torts. The district court determined that MRP had standing to bring the suit but granted summary judgment dismissing it because MRP had failed to present sufficient evidence to show injury in fact caused by Manufacturers. The court of appeals reversed the district court's determination on standing and remanded with directions to order summary judgment for Manufacturers on the issue of standing. We reverse the court of appeals on the issue of standing and remand to that court for further proceedings.

MRP is a Minnesota company that developed and operated a snowmobile racing circuit in the United States. The peak of MRP's business occurred in January 1998 when MRP reached an agreement with cable sports network ESPN to televise MRP's races as part of ESPN's Winter X–Games. Respondents are snowmobile manufacturers whose products gained exposure on MRP's racing circuit.

Around the time of the 1998 Winter X–Games, two contract agents of MRP, Joe Duncan and Scott O'Malley, twice offered to buy MRP from its owner, Jerome Dillon. Duncan and O'Malley had provided marketing services to MRP and were instrumental in the growth of the business

and securing the relationship with ESPN. Dillon declined to sell. In March 1998, Duncan and O'Malley started their own snowmobile racing circuit, the World Snowmobile Association (WSA). ESPN immediately terminated its agreement to televise MRP races and negotiated an agreement with WSA to organize races for the 1999 Winter X–Games.

MRP's revenues dropped precipitously after it lost its agreement with ESPN. In July 1998, MRP sold the snowmobile racing circuit portion of its business to WSA under an Agreement to Acquire Snowmobile Racing Program (Agreement). As required by a non-competition clause that was part of the Agreement, MRP has been out of snowmobile racing since then.

Two provisions of the Agreement have received attention in this litigation. The first defined the assets being sold as follows:

> 1.1 *"Assets"* shall mean Snowmobile Racing Program, and all right to promote, sanction and operate MRP race dates; information regarding racers, officials, sponsors and site officials, including all electronic database information; all permits, all sponsor rights and *any intangibles* and goodwill *related to the Snowmobile Racing Program,* and race dates identified on *Exhibit A.*

(Emphasis added.) The second contained MRP's representation as follows:

> 6.6 *Litigation.* There are *no claims,* actions, suits, proceedings, or investigations (whether or not purportedly on behalf of Seller) pending or threatened against or affecting Seller or the Assets * * *. There is no reasonable basis for any claim, action, suit, proceeding, or investigation against or affecting Seller or the Assets.

(Emphasis added.)

MRP's complaint alleged that the defection of Duncan and O'Malley, the forma-tion of WSA and the agreement between WSA and ESPN were all engineered pursuant to a conspiracy between Manufacturers, Duncan and O'Malley; that the conspirators' "motivation was simple: they believed they could pay less in advertising and sponsorship and increase their sales if they collectively controlled their own sno-cross racing circuit, built with the experience, background and contacts of the two former MRP representatives"; and that Manufacturers' actions violated Minnesota antitrust law and constituted the common law torts of interference with contractual relations, interference with prospective business advantage and civil conspiracy.

Manufacturers moved for summary judgment on the ground that MRP lacked standing to bring the action. Manufacturers made three arguments regarding standing: (1) that MRP had assigned all causes of action when it sold the snowmobile racing business to WSA; (2) that the quoted provisions of the Agreement expressly transferred all causes of action to WSA; and (3) that MRP failed to allege sufficient facts to show an injury in fact caused by Manufacturers.

The district court rejected Manufacturers' first two standing arguments. As to the third, the court agreed with Manufacturers that MRP had failed to allege sufficient facts to show anything more than "a theoretical dispute as to whether [Manufacturers] actually conspired against MRP to drive it out of business." The court concluded that, "[c]onsequently, MRP has no standing, and summary judgment [for Manufacturers] is proper here." Although the district court used the term "standing" to describe the legal basis for its decision, the court of appeals and all parties treat the district court's order as a conclusion that MRP *did* have standing but that MRP's failure to allege sufficient facts on

causation of antitrust injury was a decision on the merits, not on standing. *See Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 653 N.W.2d 204, 205–06 (Minn. App.2002) (*MRP*). We will adopt the same nomenclature, using the term "standing" to refer to the argument that MRP assigned all causes of action to WSA and the term "causation" to refer to the argument that MRP failed to show that it sustained injury in fact caused by Manufacturers.

The court of appeals did not address the causation arguments relied upon by the district court but instead held that MRP did not have standing to bring the suit because it sold its right to bring the suit to WSA. *Id.* at 207. The court based its ruling on the two contractual provisions quoted above and the decision in *In re Milk Products Antitrust Litigation*, 195 F.3d 430 (8th Cir.1999). *MRP*, 653 N.W.2d at 206–07.

MRP petitioned for review and Manufacturers filed a conditional cross-petition, asking us to also review the causation grounds for summary judgment if we reversed the court of appeals on standing. We granted MRP's petition but denied Manufacturers' cross-petition. Thus, the standing issue is before us, but the causation issue is not.

■ Although the court of appeals reversed the district court and vacated the summary judgment that the district court had entered on causation, the court of appeals' remand directed the district court to enter summary judgment dismissing MRP's complaint for lack of standing. Thus, our standard of review remains that

applicable to a grant of summary judgment, which is reviewed de novo. *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co.*, 615 N.W.2d 819, 827 (Minn.2000). Further, for purposes of that review, we will accept as true the claim of MRP that Manufacturers conspired with Duncan and O'Malley to put MRP out of business, and that the sale to WSA was made at a discounted price that reflected the harm that the conspiracy had visited on MRP.[1]

■ The question before us is whether MRP and WSA intended that the asset sale included the assignment to WSA of any antitrust or other commercial tort claims that MRP might have against Manufacturers. That question is not explicitly addressed in the Agreement. Further, there is no evidence that the subject was specifically discussed in the negotiations between MRP and WSA. In fact, WSA disclaims any knowledge that MRP was contemplating any claims and MRP argues that it did not learn of the factual basis for its claims until sometime after the Agreement was finalized. Thus, the question becomes whether the intent to assign the claims should be inferred from either the words that were used in the Agreement or the context in which they were used.

■ We have said that the primary goal of contract interpretation is to determine and enforce the intent of the parties. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning. *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn.1999) (citing *Bob*

---

1. A district court is to grant a motion for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled

to a judgment as a matter of law. Minn. R. Civ. P. 56.03. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

*Useldinger & Sons, Inc. v. Hangsleben,* 505 N.W.2d 323, 328 (Minn.1993)). But those words are not to be viewed in isolation. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349, 354 (Minn.1979).

> Intent is ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract * * * as a whole.

*Id.* (citations and internal quotations omitted).

The court of appeals focused on the Agreement's definition of the assets that were sold by MRP to WSA, which included "any intangibles and goodwill related to the Snowmobile Racing Program." The court held that MRP's claims against Manufacturers were "intangibles" and thus were among the assets sold by MRP to WSA. *MRP,* 653 N.W.2d at 206. The court reinforced this interpretation of "intangibles" by referring to the definition of "General intangibles" contained in Article 9 of the Uniform Commercial Code, a definition which includes "things in action." *See id.* (quoting Minn.Stat. § 336.9–102(a)(42) (2002)). Finally, the court rejected MRP's claim that it did not intend to transfer its causes of action because the Agreement contained MRP's representation "that there were no claims pending that would affect its assets and no reasonable basis for any claims affecting its assets." *Id.* at 207.

MRP maintains that there is no common understanding in Minnesota law as to whether the term "intangibles" includes causes of action—and especially antitrust claims that arise from the very agreement that refers to "intangibles." MRP points out that antitrust claims qualify as "commercial tort claims" and that the UCC provision relied on by the court of appeals expressly excludes "commercial tort claims" from its definition of "[g]eneral intangible." *See* Minn.Stat. § 336.9–102(a)(42) (2002). Finally, MRP argues that antitrust policy precludes inferring an intent to assign an inchoate antitrust claim from the nonspecific transfer of assets, relying by analogy on federal caselaw that holds that federal antitrust claims may only be assigned when done expressly and with particularity. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 438–40 (3d Cir.1993).

In considering these arguments, we have been guided by two federal court of appeals decisions regarding the question whether an inference of an intent to assign antitrust claims can be drawn from the sale of the business from which those claims arose.

Manufacturers refer us to *In re Milk Products Antitrust Litigation,* 195 F.3d at 433. In that case, the district court dismissed a proposed class action alleging price fixing by a group of milk producers, ruling that the proposed class representative, Rainy Lake One Stop, Inc. ("Rainy Lake"), lacked standing because it had sold its antitrust claims when it sold the assets of its business months before joining the lawsuit. *Id.* The court of appeals recognized that the question of whether Rainy Lake sold its unasserted and presumably unknown antitrust claim along with its other business assets was not addressed in the contract documents. *Id.* at 435. Applying Minnesota law, the court held, "the district court's finding that the parties to the sale of substantially all of Rainy Lake's business assets intended to include an unknown claim arising out of store operations must be affirmed." *Id.*

The Minnesota Court of Appeals relied heavily on *Milk Products* as recognizing that an intent to transfer antitrust claims

can be inferred from the sale of the business from which those claims arose where the seller fails to expressly exclude those claims from the sale. *MRP*, 653 N.W.2d at 206–07. But *Milk Products* is distinguishable on several grounds.

First, although *Milk Products* purports to apply Minnesota law, it actually does so at the most general level: it only affirms the primacy of the intent of the parties as the basis for contract interpretation. *See MRP*, 653 N.W.2d at 206; *Milk Products*, 195 F.3d at 435–36. To the limited extent that *Milk Products* goes beyond that general principle, it has only persuasive and not precedential value.

Second, *Milk Products* arose in the unusual context of the adequacy of the plaintiff to represent the class, and therefore the court's decision on standing is somewhat diluted by being blended with class action criteria. For example, the court made the public policy argument that it was inappropriate to presume that a seller like Rainy Lake retains the antitrust cause of action after an asset sale, because a

> named plaintiff in a large antitrust class action assumes obligations to the class and a duty to produce its books and records in class action discovery. For a small business such as Rainy Lake, these burdens may be significant, and there is no guarantee that a role as named plaintiff will increase its share of any recovery above what it would receive as an absent class member. If the on-going business has been sold prior to discovery of the antitrust claim, the decision whether to take on these burdens should rest with the purchasers.

*Milk Products*, 195 F.3d at 436.

Third, the nature of MRP's claim is significantly different from the claim made in *Milk Products*. In *Milk Products*, any injury to plaintiff Rainy Lake came from the effects of alleged price fixing on Rainy Lake's operations prior to the sale. There was no allegation that the price fixing drove Rainy Lake out of business or caused the eventual sale of the business. Further, the alleged price fixing did not impact Rainy Lake's business as a whole but only impacted the profitability of one of the dozens of products it sold at retail.

Here, in contrast, the sale of MRP's assets is alleged to be the culmination of Manufacturers' antitrust conspiracy. Reading the facts in the light most favorable to MRP, Manufacturers' intent was to drive MRP out of business; Manufacturers' actions carrying out that intent greatly diminished the value of MRP; and the eventual sale of MRP's assets at a price that reflected its now diminished market value is the measure of MRP's antitrust injury. It would be illogical to infer that MRP intended that a sale at a diminished value would include the assignment of MRP's claims against those who allegedly caused that diminished value.

Moreover, the purchaser in *Milk Products* stands in a notably different position from WSA with regard to the alleged antitrust injuries. In *Milk Products*, the purchaser was not alleged to have any connection to the price fixing, and nothing prevented the purchaser from pursuing the antitrust claims against the milk producers. Thus, it was not illogical to infer that the purchaser intended to purchase any antitrust claims associated with the business. Here, it is alleged that the purchaser, WSA, both participated in and benefited from the anticompetitive actions by Manufacturers. If Manufacturers did conspire and act to damage MRP's business, that action decreased the market value of MRP's assets, and the price that WSA ultimately paid for those assets was reduced. WSA would be incapable of pursuing a claim against its own co-conspirators or of proving any injury from a re-

duction in the market value of MRP's business. Thus, it would be illogical to infer an intent on the part of WSA to purchase MRP's claims.

MRP refers us to *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994). Former New England Patriots owner William H. Sullivan sued the NFL when the league prevented him from selling shares of the team to the public in the form of publicly traded stock. *Id.* at 1094. The league required Sullivan to sell the team to a private purchaser; he claimed that this restriction significantly decreased the market value. *Id.* A jury awarded Sullivan $51 million in damages for his losses. *Id.*

On appeal before the First Circuit, the league presented an argument similar to Manufacturers':

> The NFL argues that Sullivan cannot bring this lawsuit because he sold his antitrust claim when he sold the Patriots. The sale contract between Sullivan and KMS Patriots, L.P., provided that Sullivan transferred to the purchasers "all other assets" of the Patriots' and its holding company, besides those specifically listed and those specifically excluded. None of the listed or excluded assets include an antitrust claim. According to the NFL, the term "all other assets" should be interpreted broadly to include the present antitrust cause of action.

*Id.* at 1106 (footnote omitted). Citing two cases from the Third Circuit, the *Sullivan* court rejected the NFL's standing argument, holding that "[a]bsent some express language to the effect that Sullivan was selling his football related 'antitrust claims' or, at the very least, 'causes of action,' we cannot find that Sullivan assigned the present antitrust claim to the purchasers of the Patriots." *Id.* (citing *Gulfstream,*

995 F.2d at 437–40; *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir.1993)).

The nature of the claim being asserted by MRP is more comparable to *Sullivan* than to *Milk Products*. In both *Sullivan* and the present case, the damage to the business and the discount price at which it was sold are at the crux of the plaintiffs' claimed injuries. Moreover, MRP's standing argument is even stronger than Sullivan's because of the allegation that the purchaser, WSA, was a participant in the antitrust conspiracy.

Manufacturers argue that policy considerations favor the inference that MRP intended to assign its claims. They point out that any other interpretation is unfair to the purchaser because it "allows the seller to directly interfere with the purchaser's ability to carry on the acquired business" by making claims against the purchaser's customers. Those claims, Manufacturers argue, will disrupt the business and will directly or tangentially draw the purchaser into the litigation. Manufacturers complain that MRP represented to WSA that there were no claims that would affect the assets being sold. Manufacturers propose a rule whereby the onus would be on the seller to expressly exclude the claims from the sale or be deemed to have assigned them.

Manufacturers' policy arguments are significant in the abstract, but they do not apply to the facts as alleged by MRP. The policy of protecting the purchaser from unwanted interference with the acquired assets is strong when the purchaser is an innocent third person. But MRP alleges that WSA was not an innocent purchaser but instead a participant in and the beneficiary of the antitrust conspiracy. As such, the public policy concerns that underlie the antitrust laws take on greater prominence. The purposes of the antitrust laws would be significantly frustrated if the very sale

that was allegedly the objective of the antitrust violation would operate to preclude any claim for that violation.

We conclude that the words "any intangibles * * * related to the Snowmobile Racing Program," standing alone, do not have a generally accepted or common plain meaning that should be enforced without regard to the context in which the words were used. In a general sense, any cause of action could be regarded as an "intangible asset," but the Agreement does not make it plain that the antitrust claim is an intangible asset that is "related to the Snowmobile Racing Program," such that the intent to transfer it can be inferred solely from the use of the words "any intangibles." For example, if "related to" means "necessary or appropriate to the future operation of the Program," the antitrust claims would surely not qualify.

We further conclude that the question of whether general language transferring assets shows an intent to include inchoate antitrust claims is controlled, under the present facts, by the context of the sale and the relationship between the parties. Where the claims relate or are necessary to the ongoing operation of the business by the purchaser, and the seller is going out of business, it is logical to infer that the seller intended to assign the claims and that the purchaser expected to receive them. In contrast, where the seller is not going out of business and the claims have nothing to do with the future of the business, but instead concern injury that is personal to the seller, it is illogical to infer that the seller intended to assign them. Moreover, when the purchaser is alleged to be a member of the antitrust conspiracy that damaged the business and the beneficiary of the resulting discounted purchase price, it would be incongruous to infer that the seller intended to assign the claims to the purchaser.

We therefore hold that when the words "any intangibles * * * related to the Snowmobile Racing Program" are viewed in the context of the entire Agreement, the relationship between the parties, and the nature of the claim asserted by MRP, they do not evidence an intent of the parties to include MRP's antitrust claims as part of the sale. MRP did not go out of business but sold a portion of its business segment. MRP alleges that the conspirational actions of Manufacturers damaged the value of that portion of its business and made the sale necessary; that the purchaser, WSA, was a participant in the conspiracy; and that WSA benefited by paying a price that was substantially discounted because of the effects of the conspiracy. Assuming those allegations to be true, as we must for purposes of summary judgment, we hold that it was error to infer an intent by MRP to assign the claims or an intent by WSA to receive them.

For the above reasons, we reverse the decision of the court of appeals, reinstate the decision of the district court regarding standing and remand to the court of appeals with instructions to review the district court's grant of summary judgment based on causation.

Reversed and remanded.

BLATZ, C.J., and MEYER, J., took no part in the consideration or decision of this case.