# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2466

_____

Swift & Co., formerly known as    *
ConAgra, Inc. doing business as Swift   *
& Co.,    *
   *
       Appellant,    *
   *
     v.    *
   *
Elias Farms, Inc.,    *
   *
       Appellee.    *

_____           Appeals from the United States
                               District Court for the
No. 07-2467           District of Minnesota.

_____

Swift & Co., formerly known as
ConAgra, Inc,    *
   *
       Appellant,    *
   *
     v.    *
   *
Stan Turbes,    *
   *
       Appellee.    *
   *

_____

No. 07-2469

_____

Swift & Co., formerly known as
ConAgra, Inc.,

Appellant,

v.

William H. Johnson,

Appellee.

_____

No. 07-2470

_____

Swift & Co., formerly known as
ConAgra, Inc.,

Appellee,

v.

Elias Farms, Inc.,

Appellant.

_____

No. 07-2471

_____

Swift & Co., formerly known as

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

-2-

ConAgra, Inc.,                                          *
                                                        *
                Appellee,                               *
                                                        *
        v.                                              *
                                                        *
Stan Turbes,                                            *
                                                        *
                Appellant.                              *
                                                        *
                                                        *
        _____                                     *
                                                        *
        No. 07-2472                                     *
                                                        *
        _____                                     *
                                                        *
Swift & Co., formerly known as                          *
ConAgra, Inc.,                                          *
                                                        *
                Appellee,                               *
                                                        *
        v.                                              *
                                                        *
William H. Johnson,                                     *
                                                        *
                Appellant.                              *

                        _____

                Submitted:  March 10, 2008
                     Filed:  August 25, 2008
                        _____

Before BYE, SMITH, and COLLOTON, Circuit Judges.
                        _____

COLLOTON, Circuit Judge.

Swift & Co. ("Swift"), appeals an adverse grant of summary judgment on its breach of contract claim against Elias Farms, Inc., Stan Turbes, and William H. Johnson (collectively, "hog producers"). The hog producers cross-appeal adverse summary judgment rulings on their counterclaims for breach of contract and violations of the Minnesota Consumer Fraud Act (MCFA). We affirm the grant of summary judgment on the hog producers' counterclaims, but reverse the grant of summary judgment on Swift's breach of contract claim and remand for further proceedings.

I.

We first consider Swift's breach of contract claim against the hog producers. We review a grant of summary judgment *de novo*. *Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006). The district court held that Minnesota law applies to this diversity case, *Swift & Co. v. Elias Farms*, Nos. 05-2775, 05-2776, 05-2777, 2007 WL 1364691, at *4 (D. Minn. May 9, 2007), and neither party disputes this conclusion on appeal.

Under Minnesota law, we must first make a legal determination whether the contract is ambiguous – i.e., "whether the language used is reasonably susceptible of more than one meaning." *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982). "If the contract is unambiguous, the interpretation is a question of law, and is reviewed *de novo*." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) (applying Minnesota law). If the contract is ambiguous, however, the meaning of the contract becomes a question of fact, and summary judgment is inappropriate unless the evidence of the parties' intent is conclusive. *Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966). "[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).

In 1998, Swift entered into nearly identical contracts with the hog producers for the supply of hogs. Under the contract, Swift would pay the hog producers a "base price," which was equal to the market price, except that the base price could not be less than $40.00 per 100 pounds of live animal weight. If the market price was below $40.00, Swift would pay the hog producers $40.00 and debit the hog producers' adjustment account for the difference. When the contract term ended, each hog producer had a debit balance in his account. Section 6.02 of the contract states that: "If, *at the termination* of this Agreement, there is a debit balance in the Adjustment Account, Seller shall pay to Buyer a cash amount equal to such debit balance." (emphasis added). The issue raised by Swift's claim is whether the hog producers were required to pay Swift the debit balance at the expiration of the contract.

The parties dispute whether the expiration of the contract is the same as "the termination of [the] Agreement." Swift argues that "termination" in section 6.02 simply means "end," whether by natural expiration or by some affirmative act. The hog producers argue that termination refers only to an affirmative act – that is, something other than natural expiration. The hog producers derive this definition from the use of the word "terminated" in section 1.01 of the contract, which states: "[T]his Contract shall continue and remain in full force and effect through December 31, 2004, unless otherwise extended by the parties hereto or unless *terminated in accordance with the terms hereof.*" (emphasis added). The parties agree that "terminated in accordance with the terms hereof" in section 1.01 refers to sections 9.03 and 9.04 of the contract, which define the "termination rights" of the parties as the right to terminate the contract in the event of a default. Because section 1.01 distinguishes between the natural expiration of the contract and an earlier end by default, and uses a form of the word "terminate" to refer only to the latter, the hog producers argue that "termination" in section 6.02 must have the same meaning.

The district court agreed with the hog producers. The court noted that the dictionary definition of termination includes both an end by natural expiration and an

end by some affirmative act, but that in this case "the plain and clear language of the Contract, read as a whole and providing full effect to all provisions, limits 'termination' to an affirmative act by a party, precipitated by the other party's default." *Swift*, 2007 WL 1364691, at *8. Because neither party had exercised its termination rights under the contract, the district court granted summary judgment in favor of the hog producers.

We conclude, however, that the agreement is ambiguous, and that Swift's claim for breach of contract cannot be resolved as a matter of law. Everyone agrees that the plain meaning of "termination" does not resolve the dispute over section 6.02. Termination can be "the act of ending something," or "the end of something in time or existence." *Black's Law Dictionary* 1511 (8th ed. 2004). Moving beyond the meaning of that word in isolation, Swift and the hog producers make several arguments, based on the text and purpose of the contract, that their interpretation is correct as a matter of law. After considering these conflicting arguments, however, we conclude that the language is reasonably susceptible to either interpretation.

Both parties rely on additional textual material to support their positions. As noted, the hog producers point to the use of "terminated" in section 1.01, which refers exclusively to an act of termination, and argue that when a derivative use of the word "terminate" appears in section 6.02, it must also refer to an act of termination. On the other hand, Swift argues that because section 6.02 uses the definite article – "If, at *the termination* of this Agreement" – it unambiguously demonstrates that termination in this context is not merely a possible contingency (as with a default or other affirmative act), but an event that the parties intend definitely to occur (as with expiration). Each argument tends to support the interpretation favored by the party that advances it, but neither is conclusive. Absent countervailing textual evidence, each party's position, standing alone, could well be dispositive. But when they are pitted against each other, the textual cues conflict. The parties simply have signed an agreement that is not clear on its face.

-6-

Swift argues that termination must refer to an end, whether by an affirmative act or by natural expiration, because the hog producers' narrower interpretation would lead to absurd results. Swift argues that the purpose of the adjustment account is to protect the hog producers from market volatility. The adjustment account, Swift contends, allows the hog producers to level their income over time, with the adjustment account acting as a non-interest bearing loan. Therefore, they say, if there is a balance in the adjustment account at the end of the contract, the hog producers must repay the loan.

The hog producers, to support their narrower interpretation, argue that section 6.02 is a penalty provision, which was meant to punish the hog producers if they defaulted and Swift exercised its termination rights. This interpretation faces some challenge in explaining why section 6.02 also applies in the case of a default by Swift, because it seems strange for the agreement to penalize a hog producer who terminates the contract after the *hog buyer* defaults. But it is not necessarily unreasonable to conclude that the provision was adopted because the parties were concerned with defaults by hog producers, not with defaults by Swift, and that Swift negotiated the agreement to discourage hog producers from exercising their termination rights in the event of a default by Swift. A jury may well find this interpretation less likely than Swift's, but given the ambiguous text, we are not prepared to say it is unacceptable as a matter of law.

Because the agreement's use of "termination" is ambiguous, the interpretation of the contract becomes a question of fact, and summary judgment is inappropriate unless the evidence of the parties' intent is conclusive. *Donnay*, 144 N.W.2d at 716. Each party has submitted extrinsic evidence in support of its interpretation. Ed Brems, a former Swift vice-president who participated in the drafting and signing of the contracts, submitted an affidavit in which he stated that Swift intended that "the Contracts might 'terminate' due to the natural expiration of its term . . . [or] through an act of termination." On the other hand, hog producers Stan Turbes, William

-7-

Johnson, and Steven Elias, a shareholder and officer of Elias Farms, submitted affidavits claiming that when they entered into the contract, they understood that they would not pay the balance in the adjustment account unless the contract was terminated for default.

Swift argues that the deposition testimony of Turbes, Steven Elias, and William Elias, who signed the contract on behalf of Elias Farms, shows that they understood the balance of the adjustment account would be due at the expiration of the contract. Turbes, in response to a question by a Swift employee about how he was going to "address the issue" of the ledger balance, said that "the contract hadn't terminated yet as far as [he] was concerned." Swift argues that this statement is a concession by Turbes that he would have to pay the balance in the account at the end of the contract. William Elias said that he discussed the adjustment account with Swift employees, and that he and the employees predicted that the amount in the adjustment account would likely be $10,000 to $20,000 at the end of the contract. Swift argues that if Elias's understanding of the contract was that Elias Farms would not pay Swift the balance in the adjustment account unless there was a breach for default, then there would be no need to consider how large the balance would be at the end of the contract.[1] A reasonable jury may well consider the Turbes deposition as impeachment of his written averment that section 6.02 was limited to terminations by default, and the William Elias testimony as evidence of a different intent by Elias Farms than suggested by Steven Elias. But a jury might also reasonably conclude that the testimony can be reconciled with the affidavits because it is not explicit about the meaning of section 6.02 and is susceptible of differing interpretations. As to William

---

[1] Swift also cites this testimony of Steven Elias: "On a low market, they'd help us out, and on a high market, we would help them out. In the end it would be a wash." While the quotation could be interpreted to mean that Elias Farms would be required to pay a debit balance at the expiration of the contract, it also could be understood as a prediction about whether there would be any debit balance at all in light of market fluctuations. In fact, Steven Elias testified that "a wash" is "what everybody hoped for."

Johnson's affidavit, moreover, Swift's only argument is that it must be incredible. But we cannot say that Johnson's testimony is incredible as a matter of law; that is a question of fact for the jury. This extrinsic evidence is not sufficiently clear to resolve the ambiguity as a matter of law.

Swift also argues that the "commercial context" demonstrates that the parties intended that the hog producers would pay the balance in the adjustment account at the end of the contract. Swift relies on *Midway Ctr. Associates v. Midway Ctr., Inc.*, 237 N.W.2d 76, 78 (Minn. 1975), for the proposition that a court should consider the "surrounding circumstances" to determine what the parties must have reasonably contemplated, and it cites the provision of the Uniform Commercial Code that terms of a contract may be explained by usage of trade. Minn. Stat. § 336.2-202(a). We do not believe that usage of trade provides a clear resolution to the meaning of "termination" in section 6.02. The UCC specifies that "the existence and scope" of usage of trade "must be proved as facts," Minn. Stat. § 336.1-303(c), thus suggesting that it is for a jury to decide how much weight to give such evidence unless it is undisputed. Swift asserts that there is no dispute that the contracts at issue are "ledger contracts," which were prominent in dealings between hog producers and packers in the 1990s, and which provided for payment of debt by the producers at the expiration of the contract. But Swift cites no undisputed evidence regarding the general industry practice or the specific usage of the word "termination" in contracts between packers and producers. Perhaps such evidence could be developed, but on this record, we do not believe Swift has shown conclusively that when the parties to this particular contract used the word "termination" in section 6.02, they necessarily meant to implement the sort of ledger contract described by Swift.

The hog producers contend that if the contract is ambiguous, then it must be construed against the drafter (i.e., Swift), and that the district court's grant of summary judgment should be affirmed on that basis. Minnesota does follow the maxim that an ambiguous contract will be construed against the drafter, *e.g.*, *Turner v. Alpha Phi*

*Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979), but this rule applies only as a last resort, after all other evidence fails to demonstrate the intent of the parties. *See* 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.27, at 297-300 (Joseph M. Perillo ed., rev. ed. 1998); 11 Richard A. Lord, *Williston on Contracts* § 32:12, at 480-82 (4th ed. 1999); 2 E. Allan Farnsworth, *Farnsworth on Contracts*, § 7.11, at 290 (2d ed. 1998); *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 455 (Mich. 2003). This case involves controverted extrinsic evidence, including disputed testimony from the contracting parties and potential evidence on usage of trade, which may aid a jury in determining what the parties intended. A jury should be instructed to consider the rule that ambiguous agreements are construed against the drafter only if it is unable to determine the intent of the parties based on all of the evidence.[2]

In summary, the "termination" provision of section 6.02 of the contract is ambiguous, and neither party has produced conclusive evidence that dictates one meaning as a matter of law. We therefore conclude that summary judgment was inappropriate, and that the case must be remanded for further proceedings.

II.

A.

The hog producers cross-appeal the adverse grant of summary judgment on their counterclaim for breach of contract. Under the contract between Swift and the hog producers, the price paid to the hog producers, known as the "Market Price," was

---

[2]Swift also contends in its reply brief that the normal rule of construction should not apply in this case, because the parties agreed in section 16.07 of the contract not to construe the terms against the drafter. We express no opinion on whether this provision is enforceable under Minnesota law. *Cf. Concept Rehab, Inc. v. Short*, No. F-96-019, 1997 WL 103820, at *3 n.1 (Ohio App. 1997).

to be determined by "the daily bulk top plant-delivered price per live cwt.[3] . . . as reported by the USDA Market News Service . . . or any replacement thereof."  On March 1, 1999, the USDA changed its price reporting from live weight to carcass weight, thus forcing Swift to change its pricing formula.  On February 27, 1999, Swift sent a letter notifying the hog producers that because of the change in USDA reporting, the "market price" would henceforth be determined by "the daily base market weighted average carcass basis plant delivered price."  Swift adjusted the pricing formula twice more in 2000, with the result that higher prices were paid to the hog producers.

In their cross-complaint, the hog producers allege that Swift breached the contract because the payments made under the new pricing formula were lower than the payments that would have been made under the original formula.  In response to this claim, Swift presented expert testimony from Dr. Marvin L. Hayenga, an economics professor at Iowa State University.  Dr. Hayenga concluded that "despite the impossibility of a clear statistical comparison of the old and new pricing systems, it is highly likely the Swift changes in the pricing system (required due to the loss of the USDA report specified in the contract) led to higher prices."  The district court granted summary judgment in favor of Swift, because the hog producers failed to produce any contrary evidence.  *Swift*, 2007 WL 1364691, at *11.

The hog producers argue that Swift's second and third price adjustments demonstrate that it knew it was underpaying the hog producers.  The hog producers rely on the testimony of Swift's vice-president, Gerald Brooks, who said that the second price adjustment was his "best estimate" at the time.  But Brooks also said that Swift was "attempt[ing] to try to appease the producers."  We do not think these statements can fairly be construed as an admission by Swift that it was underpaying the hog producers.  And even if Swift had *intended* to underpay the producers, the

---

[3]"Cwt." is an abbreviation for hundredweight.

-11-

only evidence in the record comparing the pricing formulas – Dr. Hayenga's report – shows that the hog producers were most likely overpaid. Without evidence that the payments Swift was making to the hog producers were less than the amount required by the contract, the hog producers cannot show that there was a breach. We thus agree with the district court that summary judgment was appropriate on the hog producers' claim for breach of contract.

B.

The hog producers also cross-appeal the adverse grant of summary judgment on their counterclaims brought under the Minnesota Consumer Fraud Act (MCFA), Minn. Stat. § 325F.69, subd. 1. This statute prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise." *Id.* A separate statute, the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, provides that "any person injured by a violation" of the MCFA may recover damages, together with costs and attorney fees. The Supreme Court of Minnesota has held "that the Private AG Statute applies only to those claimants who demonstrate that their cause of action benefits the public," *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000), and the district court held that the plaintiffs failed to satisfy this requirement.

The hog producers, citing *Collins v. Minnesota School of Business*, 655 N.W.2d 320 (Minn. 2003), contend that their action would benefit the public, because the transactions at issue were part of a broader dissemination of similar contracts by Swift, and protection of the family farm is a public interest recognized by the Minnesota legislature. *See* Minn. Stat. § 500.24, subd. 1. Assuming, *arguendo*, that the claims brought by the hog producers would benefit the public within the meaning of Minnesota law, we conclude that there is insufficient evidence to find that Swift violated the MCFA.

The hog producers allege that Swift violated the MCFA in several ways. They argue first that when Swift changed the pricing formula, it misrepresented the effect of the pricing change. Under the original contract, the market price was to be determined by "the daily bulk *top* plant-delivered price per live cwt." (emphasis added). When Swift notified the hog producers that it was changing the pricing formula, Swift omitted the word "top" in its description of the old pricing formula. The hog producers argue that by omitting the word "top," Swift sought to mislead them into believing that the amount to which they were entitled under the old formula was lower than it was in reality, and thereby to cast the new formula in a more favorable (or at least similar) light. Even if this were true, however, the hog producers must show that they were injured. Minn. Stat. § 8.31, subd. 3a. Because the hog producers have not provided sufficient evidence to show that they were underpaid, they cannot show that they were injured.

The hog producers also allege that Swift violated the MCFA because it failed to offer them a contract that did not have an adjustment account. There is evidence that at the time the hog producers and Swift entered into the contract, Swift was offering other hog producers the option of taking a contract without an adjustment account. The hog producers seem to argue that because some of Swift's customers were allowed to choose between the two types of contract, Swift violated the consumer fraud statute by not giving them the same choice. The hog producers have failed to explain how Swift made a misrepresentation or fraudulent omission with respect to the differing contracts, or why the MCFA required Swift to offer them both types of contracts. Therefore, these claims are without merit.

Finally, Elias Farms argues that Swift employees made misrepresentations to William Elias as to the amount that most likely would be in the adjustment account at the end of the contract. Elias relies exclusively on one statement he made in his deposition. When asked whether Swift employees talked with him about the adjustment-account component of the contract, Elias said that he and two Swift

-13-

employees "figured probably 10 – 20,000 would be the (sic) – after seven years." That figure, Elias said, was based on past market performance. This testimony does not establish that any representation was made by anyone, much less that Swift made a representation that was fraudulent. According to Elias, he and the Swift employees were merely estimating what might occur in the market in the next few years based on historical averages. Elias provides no other evidence of misrepresentations, and there is insufficient evidence to create a submissible case that Swift violated the MCFA.

*　　*　　*

For the foregoing reasons, we affirm the summary judgment dismissing the hog producers' counterclaims, but reverse the summary judgment on Swift's breach of contract claim and remand for further proceedings on that claim.

_____