# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4517
_____

Qwinstar Corporation

*Plaintiff - Appellant*

v.

Curtis Anthony; Pro Logistics, LLC

*Defendants - Appellees*

_____

No. 17-1809
_____

Qwinstar Corporation

*Plaintiff - Appellant*

v.

Curtis Anthony; Pro Logistics, LLC

*Defendants - Appellees*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 19, 2017
Filed: February 16, 2018
_____

Before WOLLMAN and SHEPHERD, Circuit Judges, and GOLDBERG, Judge.[1]
_____

SHEPHERD, Circuit Judge.

Qwinstar Corporation and Pro Logistics, LLC, engaged in negotiations that culminated with Qwinstar agreeing to purchase Pro Logistics and employ its owner—Curtis Anthony[2]—for a term of five years. A few months after the sale, Qwinstar terminated Anthony's employment and filed this lawsuit against him, alleging that it did not receive the inventory it bargained for in the sale. Anthony counterclaimed, asserting that Qwinstar breached the employment contract by not paying him for the full five-year term. The parties each filed motions for summary judgment, and the district court granted Anthony's motion and denied Qwinstar's. We affirm in part and reverse in part.

## I. Background

Qwinstar and Pro Logistics are or were engaged in the business of selling and repairing old IBM check-processing systems—specifically, the IBM 3890. Pro Logistics primarily sold new and refurbished parts for this machine. Qwinstar also sells these parts, but, in addition, it has a large repair business. As a result, Qwinstar and Pro Logistics competed for many of the same customers. With the advent of

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[2]For ease of reference, we collectively refer to both Curtis Anthony and Pro Logistics as "Anthony" where possible throughout the remainder of this opinion.

computer-based systems, the demand for the parties' business shrunk considerably, and Qwinstar began efforts to acquire its competitors to increase its market share.

Negotiations between Qwinstar and Anthony ensued. In January of 2013, Anthony completed an inventory of all of the parts he owned at the time, and this 56-page document showed a total parts value of over $4.7 million. Anthony provided this inventory to Qwinstar. Subsequently, Qwinstar employees visited Pro Logistics on three separate occasions over the next several months, but no one ever made an independent inventory of the parts or compared the parts present in the warehouse to those represented in Anthony's inventory document. Ultimately, Anthony agreed to sell all of his machine parts to Qwinstar in return for $50,000 and a five-year employment contract with Qwinstar at a salary of $200,000 per year. The parties memorialized these terms in two separate contracts: (1) the Asset Purchase Agreement (APA), which dealt primarily with the transfer of Anthony's parts inventory to Qwinstar; and (2) the Employment Agreement (EA), which concerned Anthony's assumed role with Qwinstar after the sale.

After performing under these contracts for almost one year, Anthony notified Qwinstar that its parts inventory was getting low on some items. Qwinstar sent two employees to investigate the shortage, both of whom made comments afterward about the sparse quantity of parts that existed at the Pro Logistics facility. However, as with the previous visits, no one documented the remaining parts or compared the parts present to those in the January inventory. One month later, Qwinstar sent Anthony an email stating that $1 million in parts had been sold since the business arrangement had been finalized, and demanding that Anthony account for the remaining $3.4 million[3] in parts that Qwinstar purportedly purchased. Qwinstar later recovered about $600,000 in additional parts from Anthony. Shortly thereafter, Qwinstar terminated

[3]Although the original inventory listed the total value as $4.7 million, Qwinstar found roughly $300,000 in duplicate items on that list. Accordingly, the final total value reflected in the January 2013 inventory was $4.4 million.

Anthony for alleged cause and filed suit to recover the claimed shortfall in the parts inventory.

Qwinstar filed the present action asserting a breach of the APA, among other claims not relevant here. Anthony counterclaimed that Qwinstar breached the EA by failing to pay him for the full five-year contract term. Qwinstar moved for partial summary judgment, asserting that it had proven Anthony's liability for breach of the APA as a matter of law and that Anthony's counterclaim should be dismissed. Anthony moved for full summary judgment, arguing that (1) Qwinstar's APA claim should be dismissed because it could not identify a single asset that it purportedly purchased and failed to receive, and (2) Anthony was entitled to affirmative summary judgment on his counterclaim because Qwinstar terminated him without cause and without paying the full sum due under the contract. The district court first granted summary judgment to Anthony on Qwinstar's APA claim, finding that Qwinstar could not establish exactly what inventory it purchased under the APA as a result of its failure to inventory the items at the time of the sale. Qwinstar argued that the January 2013 inventory represented an accurate inventory of parts purchased, but the district court stated that the list was outdated and Qwinstar was well aware that Anthony was still selling parts during the intervening months between the date of the inventory and the execution of the APA. As a result, the district court held that Qwinstar could not establish the breach element of its claim. Next, the court granted summary judgment to Anthony on his counterclaim, finding that the contract provision governing Anthony's compensation after termination was ambiguous, and, as a result, that it must be construed against Qwinstar. Qwinstar appeals.

## II. Discussion

A party is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When construing an unambiguous contract,

"interpretation is a question of law, and is reviewed *de novo*." Swift & Co. v. Elias Farms, Inc., 539 F.3d 849, 851 (8th Cir. 2008) (internal quotation marks omitted). On the other hand, "[i]f the contract is ambiguous, . . . the meaning of the contract becomes a question of fact, and summary judgment is inappropriate unless the evidence of the parties' intent is conclusive." Id. (citing Donnay v. Boulware, 144 N.W.2d 711, 716 (Minn. 1966)).

Qwinstar argues that the January 2013 inventory established the list of items it purchased in the APA and that the EA clearly states that Anthony's full compensation is guaranteed only in the event of his death or disability. We agree with Qwinstar's latter assertion and summary judgment was premature given the ambiguous nature of the EA provisions at issue, but we reject the former because, under the unambiguous terms of the APA, Qwinstar received that which it bargained for. Accordingly, we affirm the district court's ruling on the first issue and reverse on the second.

## A. The APA

Qwinstar claims that the January 2013 inventory establishes what the term "all" meant in the APA provision stating that Anthony was conveying "all of [his] right, title and interest in and to the . . . assets." Therefore, Qwinstar continues, because there is a difference of "millions of dollars" between the value represented in the inventory and that which Anthony actually delivered, Qwinstar has proven breach as a matter of law. Anthony responds by noting that the January 2013 inventory was completed a number of months before the contract was finalized and that Qwinstar was aware that Anthony was continually selling parts during this time. As a result, Anthony concludes, Qwinstar cannot prove breach because it cannot prove what it purchased under the contract and how that differs from what it received. We agree.

"In order to state a claim for breach of contract, the plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent

to his right to demand performance by the defendant, and (3) breach of the contract by defendant." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011). To determine whether a breach occurred, the court must first decide what performance was due under the contract.

Under Minnesota's parol evidence rule,

[t]erms . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Minn. Stat. § 336.2-202. In other words, "courts should not interfere with a contract when the rights of the parties are evidenced by writing which purports to express their full agreement." St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp., 428 N.W.2d 877, 880 (Minn. Ct. App. 1988). Thus, "where a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible." Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312 (Minn. 2003) (internal quotation marks omitted). But "[p]arol evidence of any prior agreement is inadmissible where the agreement is unambiguous and completely integrated." Maday v. Grathwohl, 805 N.W.2d 285, 288 (Minn. Ct. App. 2011). "A merger clause establishes that the parties intended the writing to be an integration of their agreement." Alpha Real Estate, 664 N.W.2d at 312. And "a court need not look beyond the writing to determine whether a contract is a complete integration, where a clause explicitly states the parties' intent." Maday, 805 N.W.2d at 289 (internal quotation marks omitted).[4]

---

[4]Alpha Real Estate and Maday were both decided under common law principles, rather than those expressed in the Minnesota Uniform Commercial Code

We find that the APA is unambiguous; therefore, no external evidence can be admitted to contradict, explain, or supplement the terms contained therein. Section 1.1 of the APA states: "On the terms and subject to the conditions set forth in this Agreement, [Anthony] hereby sells . . . to [Qwinstar] all of [Anthony's] right, title and interest in and to the following assets." R. at A-1657. The "assets" are then defined to include, inter alia, "all finished goods, raw materials, work in process, packaging, parts, supplies, tooling and other inventory." R. at A-1657. Section 7.6 then provides that "[t]his Agreement . . . constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement, superseding all oral and written proposals, representations, understandings and agreements previously made or existing with respect to such subject matter." R. at A-1664 to A-1665.

The contract means precisely what it says: Anthony agreed to sell all inventory he had at the time the APA was executed. See Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 67 (Minn. 1979) ("[T]he language found in a contract is to be given its plain and ordinary meaning."). Because the parties included the integration clause, it is clear "that the parties intended the writing to be an integration of their agreement." Alpha Real Estate, 664 N.W.2d at 312. Had the parties wished to define the "assets" to include all parts described in Anthony's inventory list, they could have incorporated that document into the APA by reference. See Lund, 2002 WL 1327012,

_____

(UCC). But St. Croix Printing applied the same logic in the UCC context to hold that "a clause stating that the 'written agreement is a complete and exclusive statement of the terms of the agreement' will likely be sufficient to exclude from any evidence proof of any oral warranty." 428 N.W.2d at 880. Thus, because the principles announced in Alpha Real Estate and Maday are in agreement with Minn. Stat. § 366.2-202(b), those cases are instructive of how the Minnesota Supreme Court would address this issue. See also Lund Indus., Inc. v. Wonder Indus., Inc., No. C0-01-2118, 2002 WL 1327012, at *5 (Minn. Ct. App. June 18, 2002) (unpublished) (applying above principles to determine a contract under the UCC was unambiguous).

at *6.[5] But this did not occur, and, prior to the sale, no one from Qwinstar conducted an independent inventory of the parts on their many trips to Pro Logistics. Ultimately, because Qwinstar has presented no evidence that Anthony failed to deliver the inventory he possessed at the time the APA was executed, Qwinstar is unable to prove that Anthony breached the contract. See Hamann, 808 N.W.2d at 833 (stating that proof of "breach of the contract by defendant" is necessary to state a claim).

## B. The EA

Anthony contends that Qwinstar breached the EA by terminating his employment prior to the expiration of the full five-year contract term. According to Qwinstar, the EA clearly provides for the continued payment of Anthony's salary only if the Agreement itself is terminated by his death or disability. Moreover, even assuming the EA is ambiguous, Qwinstar contends that the district court improperly relied on one interpretive device to the exclusion of all others, and parol evidence reveals the parties' intent. We conclude that summary judgment was prematurely granted on this claim because the material provisions are ambiguous and the parties' intent is inconclusive. See Swift & Co., 539 F.3d at 851.

"[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn. 2003). "A court ascertains the parties' intent by putting itself in the parties' positions at the time they formed the contract and determining

---

[5]Moreover, "[h]ere we have a contract between 'merchants,' [and] [t]here is no unequal bargaining power." St. Croix Printing Equip., 428 N.W.2d at 880; see also id. at 881 ("While St. Croix could have inspected the press prior to 'sealing' the agreement, Sexton declined any opportunity to inspect the press. At minimum, Sexton was fully aware of the danger in foregoing personal inspection and should have foreseen the possibility that the printer would not be in the same condition as was alleged, especially since such equipment is disassembled prior to shipping.").

what they reasonably meant to accomplish in view of the contract as a whole, its plain language, and the surrounding circumstances." Ecolab, Inc. v. Gartland, 537 N.W.2d 291, 295 (Minn. Ct. App. 1995). "Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." Motorsports Racing Plus, 666 N.W.2d at 323. A contract is ambiguous when "'the language used is reasonably susceptible of more than one meaning.'" Swift & Co., 539 F.3d at 851 (quoting Blattner v. Forster, 322 N.W.2d 319, 321 (Minn. 1982)).

Minnesota courts employ several interpretive maxims when discerning the parties' intent. First, courts should "construe a contract as a whole and attempt to harmonize all clauses of the contract." Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 525 (Minn. 1990). "Because of the presumption that the parties intended the language used to have effect," Minnesota courts "will attempt to avoid an interpretation of the contract that would render a provision meaningless." Id. at 526. Second, "[w]here there is an apparent conflict between two clauses or provisions of a contract, it is the court's duty to find harmony between them and to reconcile them if possible." Nat'l City Bank v. Engler, 777 N.W.2d 762, 765 (Minn. Ct. App. 2010) (internal quotation marks omitted). Any "[a]pparent conflicts between clauses will be resolved by giving full effect to principal and more important clauses and subordinating thereto those of minor importance." Id. Third, "if the language is ambiguous—that is, susceptible to more than one reasonable interpretation—parol evidence may be considered to determine the intent of the parties." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 832 (Minn. 2012). Finally, "[a] fundamental principle of contract law is that when contract language is reasonably susceptible of more than one interpretation it is ambiguous, and ambiguous contract terms must be construed against the drafter." Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 148 (Minn. 2002); see also Gartland, 537 N.W.2d at 295 ("[W]here a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary

meaning was intended by the parties at the time of its execution." (alteration in original) (internal quotation marks omitted)).

The following language from the EA is critical to our discussion:

> Effect of Termination on Compensation. If Employee's employment with Company is terminated by Employee or Company, Company will have no further liability to Employee under this Agreement other than to pay Employee the Employee's Base Salary and benefits under Section 3 accrued, and expenses properly incurred, through the date of termination or resignation; provided, however, that if this Agreement is terminated under Section 4 for any reason, the Company will continue to pay the Employee (or his estate in the event of his death) the Base Salary for the balance of the five-year Term of this Agreement remaining after the date of any such death or Disability.

EA § 4(d). Analyzing this language, the district court found that "if Anthony's *employment* is terminated, Qwinstar owes him nothing beyond his salary and benefits accrued through termination." On the other hand, the court noted, "the second clause guarantees Anthony his full five-year salary if the *Agreement* is terminated 'under Section 4 for any reason.'" After concluding that this provision was ambiguous, the court applied the fourth interpretive aid from above—that ambiguous contracts are construed against the drafter—to conclude that the second clause controlled and Anthony was therefore entitled to his full salary.

Although we agree with the district court that the provision is ambiguous and should therefore be construed against Qwinstar, see Hilligoss, 649 N.W.2d at 148, "this does not . . . ineluctably lead to the conclusion that . . . [Qwinstar] is to lose," Turner, 276 N.W.2d at 67; see also Swift & Co., 539 F.3d at 854 (applying Minnesota law and stating "this rule applies only as a last resort, after all other evidence fails to demonstrate the intent of the parties"). Instead, we must turn to the other interpretive tools to aid in the ultimate goal of ascertaining the parties' intent. See Turner, 276

N.W.2d at 67. To be sure, the district court's interpretation was not without some persuasive force, but application of the remaining three interpretive aids leads us to conclude that "the language is reasonably susceptible to" the alternative Qwinstar advances. See Swift & Co., 539 F.3d at 852.

One could reasonably interpret the second clause—the clause guaranteeing full compensation—to apply only when Anthony's death or disability led to the termination of the agreement. First, this interpretation harmonizes and provides meaning to both clauses. See Chergosky, 463 N.W.2d at 525. On the other hand, the district court's interpretation—that Anthony received payment in full regardless of the reason for his termination—renders the first clause meaningless because there is seemingly no context in which that clause would apply, and Minnesota courts "will attempt to avoid an interpretation of the contract that would render a provision meaningless." Id. at 526.

Second, reading the second clause as an exception to the first harmonizes the apparent conflict between the provisions. See Engler, 777 N.W.2d at 765. Therefore, in an attempt to "giv[e] full effect to principal and more important clauses and subordinating thereto those of minor importance," id. (internal quotation marks omitted), the first clause should be viewed as the general rule: In the event that either party terminates Anthony's employment, Qwinstar must pay Anthony only the salary and benefits accrued to that point. The second clause, by contrast, provides an exception to the first: If the Agreement is terminated under Section 4(b)[6]—the

---

[6]The contract states "under Section 4," rather than under Section 4(b). Given the later reference to "such death or Disability," we believe the parties' intent was for the second clause to actually reference Section 4(b). See Restatement (Second) of Contracts § 202, cmt. d (1981) ("To fit the immediate verbal context or the more remote total context particular words or punctuation may be disregarded or supplied; clerical or grammatical errors may be corrected; singular may be treated as plural or plural as singular."); id. § 201, cmt. b ("Uncertainties in the meaning of words are ordinarily greatly reduced by the context in which they are used.").

provision that automatically terminates Anthony's employment upon his death or disability—then Qwinstar is required to pay the salary for the remainder of the five-year term "after such death or Disability." See Advantage Consulting Grp. v. ADT Sec. Sys., Inc., 306 F.3d 582, 586 (8th Cir. 2002) (applying Minnesota law and noting that "it makes sense that parties will address issues of more importance first, followed by those of less importance[;] . . . although a term's location in a contract is certainly not dispositive, it may be indicative, of intent"). Here, as in Advantage Consulting, "[i]f we recognize the [first] provision[] as the principal and more important clause[] in this contract, the [second provision] still serves a purpose." Id.; Restatement (Second) of Contracts § 203, cmt. e ("If the specific or exact can be read as an exception or qualification of the general, both are given some effect . . . .").

Finally, because the provision is ambiguous, "parol evidence may be considered to determine the intent of the parties." Caldas, 820 N.W.2d at 832. Qwinstar produced an earlier version of the agreement which read, in relevant part:

> If Employee's employment with Company is terminated by Employee or Company, Company will have no further liability to Employee under this Agreement other than to pay Employee the Employee's Base Salary and benefits **per the five-year Term**, and expenses properly incurred; provided, however, that if this Agreement is terminated **as a result of the death or Disability of the Employee**, the Company will continue to pay the Employee (or his estate in the event of his death) the Base Salary for the balance of the five-year Term of this Agreement remaining after the date of any such death or Disability.

(emphases added). The differences between this document and the final version are emphasized to show that, if the court were to adopt Anthony's current reading of the contract, the outcome would be the exact same as it would have been under the earlier draft agreement between the parties: Anthony receives his full salary regardless of the reason for his termination. Regardless of the parties' ultimate intent, a reasonable juror could conclude that the parties amended these provisions intending to create a

-12-

different outcome. Additionally, Anthony stated in his deposition that during these negotiations he understood the second clause to mean that in the event of "the demise of myself, . . . the contract would still be in force for my family." R. at A-648. Though Anthony's admission may not be as conclusive as Qwinstar asserts, it still provides valuable evidence of the parties' intent at the time the contract was formed.

Summary judgment was inappropriate on Anthony's counterclaim because the contract provisions are ambiguous and reasonably susceptible to more than one interpretation. As such, interpretation becomes a question of fact precluding summary judgment.[7]

## III. Conclusion

For the reasons above, we affirm the district court's grant of summary judgment to Anthony and Pro Logistics on Qwinstar's breach of contract claim. We reverse, however, the court's grant of summary judgment to Anthony and Pro Logistics on their counterclaim and remand for further proceedings.

———————————————

---

[7]Prior to argument, Qwinstar submitted a motion asking the court to take judicial notice of documents it states are relevant in limiting Qwinstar's damages on Anthony's counterclaim. We grant the motion, but, because we decide this issue in Qwinstar's favor, we leave it to the district court to determine the materiality of this information on remand.